## The Quincy, Missouri and Pacific Railroad Co.

### *v.*

### Isaac N. Morris.

1. Municipal subscription—*under constitution of* 1870, *upon an elec-
tion had prior thereto.* That section of the constitution of 1870 which
prohibits municipal subscriptions to railroads or private corporations,
except upon a vote of the people of the municipalities, had prior to the
adoption of the constitution, operates to prohibit any such subscription,
unless the prior vote in reference thereto was had under an existing law.
A merely voluntary vote, even though it was directed by an ordinance of a
city in which the proposition was pending, will not avail to remove the
restriction.

2. SAME—*exception in respect to the city of Quincy.* Under the 24th section of the schedule of the constitution of 1870, exempting the city of Quincy from the prohibition mentioned, so far as the people of that municipality had voted for such purpose prior to the 13th day of December, 1869, it is *held*, that a vote on the subject of municipal subscription, had by the people of that city in pursuance of an ordinance thereof, but not under any then existing law, was valid and effectual for the purpose of such subscription.

3. SAME—*subscription by the city of Quincy to the capital stock of the Quincy, Missouri and Pacific Railroad Company.* So it is held, that a subscription by the city of Quincy to the capital stock of the Quincy, Missouri and Pacific Railroad Company, made after the adoption of the constitution of 1870, in pursuance of a vote of the people of that city had on the 7th day of August, 1869, not, however, under any existing law, was a valid and binding subscription, and the city was authorized to issue its bonds therefor acoording to the conditions upon which the subscription was made, and this, without reference to the validity of that portion of the statute which took effect on the 1st day of July, 1871, purporting to legalize the election mentioned.

4. SAME—*power of the legislature to authorize the subscription without a vote—effect of constitution of 1870.* Further, the last clause of section 24 of the schedule of the constitution of 1870, left the power in the legislature to authorize the city of Quincy to make the subscription, precisely as it was under the constitution of 1848, under which the subscription could have been authorized without any vote on the subject by the people,—and that authority was conferred by the act in force July 1, 1871.

5. SAME—*corporate purpose—subscription to railroad in another State.* The creation of municipal indebtedness in the subscription to the capital stock of a railroad lying wholly in another State, is for a corporate purpose; as, in the case of the city of Quincy, situated upon the western border of the State, subscribing to the stock of a railroad to be constructed from a point on the Mississippi river, opposite that city, in the State of Missouri, to a point westward, in Nebraska.

6. STATUTES—*of the title.* An act was entitled "An act to authorize the city of Quincy to create the indebtedness referred to in the twenty-fourth section of the schedule of the constitution, to provide for payment thereof, and validating acts of said city relating thereto." The act authorized the city to subscribe to the capital stock of a railroad company, and to issue evidences of indebtedness therefor: *Held*, the nature and true scope of the act were indicated by the title, and that was sufficient.

APPEAL from the Circuit Court of Adams county; the Hon. JOSEPH SIBLEY, Judge, presiding.

Messrs. Wheat & Marcy, for the appellant.

Messrs. John M. & John Mayo Palmer, and Messrs. Thoroughman & Warren, for the appellee.

Mr. Justice Craig delivered the opinion of the Court:

This was a bill in equity, brought by Isaac N. Morris, a resident property owner and tax-payer in the city of Quincy, to perpetually enjoin the mayor and aldermen of the city from issuing bonds amounting to the sum of $250,000 to the Quincy, Missouri and Pacific Railroad Company, in payment of a subscription of stock previously made by the city to the capital stock of the company.

The court proceeded to a hearing on bill, answer, replication and proofs, and a decree was rendered in favor of complainant, as prayed for in the bill, to reverse which the railroad company has taken this appeal.

The company was organized on the 24th day of June, 1869, for the purpose of constructing a railroad from a point on the Mississippi river, opposite Quincy, to a point on the Missouri opposite Brownsville, Nebraska. The length of the proposed road was about two hundred and thirty miles. The citizens of Quincy manifested a deep interest in the success of the enterprise; they were large stockholders in the company, and when it was organized a majority of its directors and officers were residents of Quincy. On the 7th day of August, 1869, an election was held in the city, under an ordinance previously passed by the city council for that purpose, providing an election for the voters to vote upon a proposition that the city should subscribe $500,000 to the capital stock of the company, on certain conditions named in the ordinance. At the election, 2134 votes were polled, 1949 of which were in favor of subscription, while 185 were against it. At the time, however, the election was held, there was no law in force authorizing the city to become a stockholder in the company, or authorizing a vote of the people of the city on the question.

The making of the subscription was, therefore, deferred until legislation could be obtained upon the subject.

The convention that assembled in December, 1869, to form a new constitution for the State, adopted a section as follows: "No county, city, town, township, or other municipality, shall ever become subscriber to the capital stock of any railroad or private corporation, or make donation to or loan its credit in aid of such corporation: *Provided, however,* that the adoption of this article shall not be construed as affecting the right of any such municipality to make such subscriptions where the same have been authorized under existing laws, by a vote of the people of such municipalities, prior to such adoption." The effect of this provision of the constitution would clearly have defeated the proposed Quincy subscription, as the vote then had was not under an existing law. The convention, with the view, no doubt, of leaving the proposed Quincy subscription unaffected by this clause of the constitution, adopted section 24 of the schedule, in these words: "Nothing contained in this constitution shall be so construed as to deprive the General Assembly of power to authorize the city of Quincy to create any indebtedness for railroad or municipal purposes, for which the people of said city have voted, and to which they shall have given, by such vote, their assent, prior to the thirteenth day of December, in the year of our Lord one thousand eight hundred and sixty-nine: *Provided,* that no such indebtedness, so created, shall, in any part thereof, be paid by the State, or from any State revenue, tax or fund; but the same shall be paid, if at all, by the said city of Quincy alone, and by taxes to be levied upon the taxable property thereof: *And, provided, further,* that the General Assembly shall have no power in the premises that it could not exercise under the present constitution of the State."

At the first session of the legislature 'after the adoption of the constitution, an act was passed which took effect on the 1st day of July, 1871, the first section of which declares, that the city of Quincy may subscribe $500,000 to the capital stock of the Quincy, Missouri and Pacific Railroad Company, upon

such conditions as to the city council of said city shall seem best for the interest of said city, subject, however, to the conditions herein contained, and issue evidences of indebtedness in payment thereof, and raise money to pay the same, for which the people of said city voted, and to which they, by such vote, gave their assent, prior to the 13th day of December, 1869: *Provided*, that no such indebtedness, so created, shall, in any part thereof, be paid by the State, or from any State revenue; but the same shall be paid by said city of Quincy alone, and by taxes to be levied upon the taxable property thereof: *And, provided, further*, that the evidences of such indebtedness to be issued by said city shall be issued in conformity with the terms, conditions, requirements and provisions of the order or orders of said city council of said city, submitting the proposition to subscribe to the capital stock of said railroad company to a vote of the people of said city, except as herein expressly provided; and the records and files of said city, of an affirmative vote therefor, shall be *prima facie* evidence of such vote and of such assent. And any election held in said city prior to said day, for the purpose of such vote being taken, and any contract or subscription made, or to be made, by said city, to the capital stock of said railroad company, in pursuance thereof, and any bonds or other evidences of such indebtedness issued or to be issued by said city, are hereby declared valid.

On the 17th day of July, 1871, at a meeting of the city council, an order or resolution was adopted directing the mayor to make the subscription of $500,000 to the capital stock of the company, which was accordingly done, and upon the receipt of $250,000 of stock, bonds were then issued to the company for that amount. It also appears that the conditions contained in the subscription, to be performed by the company to entitle it to secure bonds for the remaining $250,000 of the subscription, have been complied with, and the mayor and city council were about to issue bonds for the balance of the subscription, when this bill was filed.

We do not propose to consider the question, whether the

last clause of section 1 of the act in question, which purports to legalize the election, is constitutional or unconstitutional, as, in our opinion, the validity of the subscription does not depend upon that part of the act. If the corporate authorities of the city of Quincy had the power to make the subscription without a vote of the people of the city, then the subscription may be binding, notwithstanding the legislature did not possess the power or authority, under the constitution, to legalize the vote.

The first part of section 1, of the act, expressly authorizes the city of Quincy to subscribe $500,000 to the capital stock of the railroad company, issue its bonds, and levy and collect taxes to liquidate the principal and interest. After this authority was conferred, the subscription was made. Under the constitution of 1848 it was expressly held, in *Keithsburg* v. *Frick*, 34 Ill. 421, that the power to make a subscription to the capital stock of a railroad company might be conferred by the legislature directly upon the trustees of the incorporation, or the city council, and exercised by them without a vote of the people of the municipality. Unless, therefore, that portion of the act which purports to place the power to make the subscription in the hands of the city, is in conflict with some provision of the constitution of 1870, it must be sustained, although that portion of the act which professes to legalize the vote may be inoperative or void. It is apparent that if section 24 of the schedule had been omitted from the constitution, the other clause prohibiting a city from becoming a subscriber to the capital stock of a railroad company, except where it had been authorized under existing laws by a vote of the people, would have forever deprived the city from becoming a stockholder in this company. This was, no doubt, foreseen and fully appreciated by the framers of the constitution. Was section 24 of the schedule engrafted upon the constitution as an idle ceremony, or was there a hardship, supposed or real, likely to fall upon a portion of the State on account of the restrictions contained in the other clause, which this was intended to remedy? That the latter was the object and pur-

pose of the section, we apprehend, can not admit of a well founded doubt. But it is said section 24 restricted the legislature to act only in case there had been a legal vote in the city. We do not, however, so understand the section. Indeed, if the vote had been had under an existing law, no necessity for the section is perceived, as it would have been protected under the other provision of the constitution. The language used is, "for which the people of said city shall have voted, and to which they shall have given, by such vote, their assent."

An election had been held under an ordinance passed by the city council, at which the legal voters of the city had full and a fair opportunity to express their views at the polls. Ample notice had been given of the election. It was held and conducted, in all respects, in conformity to the laws of the State regulating the holding of general elections. All the safeguards for preventing fraud or illegal voting were observed. The election to vote upon the question of subscription, although no law was in force authorizing it to be held, it is conceded, was fairly conducted, and, as appears from the evidence, it resulted in a large majority of the legal votes cast being in favor of the subscription of $500,000 to the capital stock of the railroad company. Under these circumstances it can not be successfully denied that the people of the city had voted, and that in and by such vote they had given their assent, not, perhaps, *de jure,* but *de facto,* and while, in contemplation of law, the vote was not legal, and of itself conferred no power, as was held in *Barnes* v. *Town of Lacon, post,* p. 462, yet we incline to the opinion, this was such a vote as was contemplated by the language used in the section of the constitution under consideration. If a legal vote was contemplated by that language, the adoption of the section was an idle delusion, as the framer of it announced to the convention, as appears from the debates, that the vote had been taken without authority of law.

We are, therefore, of opinion, that while section 24 of the schedule did not, in the least, legalize or sanction what had been done by the voters of the city, its obvious intent and effect were to leave the matter and the power of the legislature over it unaffected by the constitution of 1870—in other words,

to leave the vote and the power of the legislature to confer the right upon the city to take stock, precisely as they would have been under the constitution of 1848. The last clause in the section itself would seem to confirm this view. It reads: "*Provided, further,* that the General Assembly shall have no power in the premises, that it could not exercise under the present constitution of the State," which would seem to imply that the power which could be exercised under the constitution of 1848 was to be retained.

If we are correct in this, then it follows that the constitution did not prohibit the legislature from conferring the power on the city of Quincy to subscribe to the capital stock of the company, and thus far the act must be sustained.

Objection has been made to the title of the act, but the nature and true scope of the act are indicated by the title, and this we regard sufficient.\*

But the position is taken by the complainant, that the subscription was not for a corporate purpose, and this is based upon the ground that the railroad in which the city became a stockholder lies wholly in the State of Missouri. This court has held in numerous cases, beginning with that of *Prettyman* v. *Tazewell County*, 19 Ill. 406, that, under the constitution of 1848, the legislature might confer power on cities, towns and counties to become stockholders in railroad companies organized under our laws, and to be constructed within our State, and that a debt created by the municipality to aid in the construction of a public improvement of that character was for a corporate purpose, within the meaning and spirit of the constitution.

The theory upon which these decisions hold a debt created for the construction of a railroad to be a corporate purpose is, that the trade and commerce of the municipality is increased,

---

\*The title of the act is, "An act to authorize the city of Quincy to create the indebtedness referred to in the twenty-fourth section of the schedule of the constitution, to provide for payment thereof, and validating acts of said city relating thereto." Acts 1871-2, p. 272.

property is enhanced, and the general prosperity and welfare of the entire municipality are promoted.

In *Johnson* v. *Stark County*, 24 Ill. 88, where the question first arose, it was said: "It, then, becomes necessary to ascertain whether the aiding in the construction of a railroad running through its limits is such a corporate purpose as authorizes the legislature to confer upon it that power. That the public at large, the individual shareholder of the company, and the citizens of the county, all have an interest in the construction of such a road, is too plain to admit of any doubt. By its completion, the public have increased facilities for travel and transportation, the shareholders the prospect of profit in their investment, and the citizens of the county have afforded to them increased facilities for trade and commerce, enhanced value to property within their local divisions, with more speedy development of their agricultural and other resources. \* \* \* In the completion of these improvements the whole community is either immediately or remotely interested—those near the line on which it passes in a larger, and those more remotely situated in a less degree, but all participate in its benefits." Again, in *Taylor* v. *Thompson*, 42 Ill. 9, a corporate purpose was defined to be a tax to be expended in a manner which shall promote the general prosperity and welfare of the municipality which levies it. In *Chicago, Danville and Vincennes Railroad Co.* v. *Smith*, 62 Ill. 268, the question arose whether a donation made by a town to a railroad company could be regarded as a debt created for a corporate purpose. The court referred to the definition of a corporate purpose, as given in *Taylor* v. *Thompson, supra*, and said: "We accept this definition, and are of opinion that no person can doubt but that taxes expended to aid in the construction of a railroad must promote the general prosperity."

The question then recurs, does the fact that the railroad is to be constructed in another State, although it starts at Quincy, destroy its usefulness to the citizens of Quincy? Does it fail to promote the general prosperity and welfare of the municipality merely on account of its line being wholly within another

State? If it does, the argument of complainant is plausible. But, on the other hand, if a railroad constructed through an adjoining State to a city in this State situated upon the State line, will develop the commerce, increase the trade, enhance the value of property, and generally add as much to the prosperity and welfare of the municipality as if the line of the road was constructed within this State, we perceive no reason or principle for holding that a debt incurred for the construction of such a road would not be for a corporate purpose, as much so as if the road was built wholly in this State. The city of Quincy is situated on the Mississippi river, on the west line of the State. Here is a projected railroad from Quincy west 230 miles, through a fine agricultural country. At the time this bill was filed, the entire line had been surveyed, three miles on the west end had been graded and ready for the iron, and forty-five miles of the road had been completed from Quincy west, and was in successful operation, carrying passengers and freight. To say that an enterprise of this character would add nothing to the commerce and prosperity of Quincy, would do no less than repudiate what has been held by this court in numerous cases, from the time the decision in *Johnson* v. *Stark County, supra,* was announced, down to the present time.

But that a city or county of one State may aid in the construction of a railroad that lies in another State, has been decided by courts of respectability and high authority. We need only refer to the following authorities in confirmation of the principle: *Railroad Company* v. *County of Otto,* 16 Wall. 667; *Walker* v. *Cincinnati,* 21 Ohio St. 14; *McCallin* v. *Mayor, etc.* 3 Head (Tenn.) 317; *St. Joseph and Denver Railroad Co.* v. *Buchanan Co.* 39 Mo. 485; *Bell* v. *Railroad Co.* 4 Wall. 598; *Copes* v. *Charleston,* 10 Richardson, 491; *Stone* v. *Mobile,* 24 Ala. N. S. 591. The same principle has also been recognized in *Shapless* v. *Mayor,* 21 Pa. St. 147; *Gepeck* v. *Duboke,* 1 Wall. 175; *Gooddin* v. *Crump,* 8 Leigh, 120.

No argument is needed to demonstrate that a city situated

as Quincy, is more interested and derives more benefit from a public improvement, such as the construction of a railroad, extending from the city west into the State of Missouri, than east through our own State. Her merchants supply the country west with goods, her manufactories furnish the various implements of husbandry, and in turn she receives the various products of the country, while the country east seeks other channels of trade. Under the authorities, we are of opinion that the debt in question was legally created, and for a corporate purpose.

The decree of the circuit court will, therefore, be reversed, and the cause remanded with directions to the circuit court to dismiss the bill.

*Decree reversed.*