## QUINCY *v.* COOKE.

The General Assembly of Illinois enacted, March 27, 1869, a statute as follows: "The acts of the city council of the city of Quincy, from June 2, 1868, to August 28, 1868, in ordering an election on the proposition to subscribe $100,000 to the capital stock of the Mississippi and Missouri River Air Line Railroad Company, and the subscription of said stock, and all other acts of said council in connection therewith, are hereby legalized and confirmed." In conformity with the vote of the citizens of Quincy cast at such an election, the council had, by an ordinance of Aug. 7, 1868, subscribed for that amount of said capital stock; but neither the election nor the subscription was authorized by law. After the statute took effect, negotiable coupon bonds were, by virtue of it and the ordinance, issued in the sum of $100,000 to the company by the city, and the latter received therefor an equal amount of said stock. In a suit by A., a *bona fide* holder of coupons detached from the bonds,—*Held*, that they are valid obligations of the city.

ERROR to the Circuit Court of the United States for the Southern District of Illinois.

The case is stated in the opinion of the court.

*Mr. Carl E. Epler* for the plaintiff in error.

*Mr. James Grant*, *Mr. Whit. M. Grant*, and *Mr. William Mc-Fadon* for the defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

On the seventh day of August, 1868, the city council of Quincy, Illinois, — in conformity with a vote of the people at an election held under the authority of a resolution adopted by that body on the ninth day of June previous, — passed an ordinance empowering and directing the mayor to subscribe $100,000, payable in city bonds, to the capital stock of the Mississippi and Missouri River Air Line Railroad Company, a corporation created under the laws of Missouri. The object of the subscription was to aid in the construction of a railroad (lying wholly within the State of Missouri) from West Quincy northwesterly, connecting Quincy with the road of that company. The ordinance made it a condition of the issue and payment of the bonds that there should be expended the sum of $50,000 "in grading, bridging, and tieing the road," commencing at West Quincy, for a distance of twenty-five miles; further, that due guarantees be given, before the bonds were

issued, that their proceeds should be so expended, — "the city council of Quincy to determine on the compliance with said conditions and issue of bonds in payment of the subscription."

On the succeeding day, the city, by its mayor, made the subscription upon the required conditions.

The General Assembly of Illinois passed, March 27, 1869, a statute declaring "that the acts of the city council of the city of Quincy, from June 2, 1868, to Aug. 28, 1868, in ordering an election on the proposition to subscribe $100,000 to the capital stock of the Mississippi and Missouri River Air Line Railroad Company, and the subscription of said stock, and all other acts of said council in connection therewith, are hereby legalized and confirmed." 3 Pri. Laws Ill., 1869, p. 376.

On the 1st of January, 1870, the city council issued to the company, in part payment of said subscription, fifty bonds of the city, of $500 each, numbered from one to fifty, inclusive; and, on May 18, 1870, in further payment, seventy-five additional bonds, numbered from fifty-one to one hundred and twenty-five, inclusive. The remainder, dated July 1, 1870, were issued on Nov. 12, 1870, in further and full payment. Upon each delivery of bonds the city received in exchange an equal amount at par value of the stock of the railroad company. The bonds, negotiable in form, were made payable to the railroad company or bearer at the National Bank of Commerce in New York. They purport to have been issued under and by virtue of the ordinance of Aug. 7, 1868, and of the said act of assembly. The present action was brought to recover the amount of certain coupons of the bonds so issued.

The special finding shows that all of the coupons sued on, except one, were of the bonds issued and delivered Jan. 1 and May 18, 1870; that the bonds from which the coupons sued on were taken, with all their coupons, were purchased by plaintiff for value, before maturity, in open market, in the usual course of business, and without notice of any infirmity therein; that the railroad company, from the commencement of the construction of its road, owned and ran its trains from West Quincy into and out of Quincy over the bridge connecting those two places; that the city, for six years after issuing the bonds, paid the successive annual instalments of interest,

and by an agent, regularly appointed for that purpose, voted its stock at one or more meetings of stockholders held after July 2, 1870.

It is not necessary to consider separately the various questions of law upon which there occurred, at the trial, a difference of opinion between the judges. They are all more or less involved in the general inquiry as to the existence of legislative authority for this issue of bonds.

1. Such authority cannot be found in the original charter of the city or in the act of Feb. 16, 1857. The former gives the city council power " to appropriate money and provide for the payment of the debt and expenses " of the city; the latter authorized that body " to issue city bonds to any amount not exceeding, at one time, in the aggregate, the sum of $75,000." These provisions manifestly relate to debts and expenses incurred for ordinary municipal purposes, and not to railroad subscriptions, the authority to make which must be expressly conferred by statute. These bonds upon their face show that they were executed in payment of a subscription of the latter character, and, consequently, purchasers were charged with notice that they were not issued for ordinary municipal purposes under any power conferred by the charter of the city or by the act of 1857.

2. The question of legislative authority is not determinable by that provision of the Illinois Constitution of 1870 which — saving municipal subscriptions made under existing laws by a popular vote prior to its adoption — declares that " no county, city, town, township, or other municipality shall ever become subscriber to the capital stock of any railroad or private corporation, or make donation to, or loan its credit in aid of, such corporation: *Provided, however*, that the adoption of this article shall not be construed as affecting the right of any such municipality to make such subscriptions when the same have been authorized, under existing laws, by a vote of the people of such municipalities prior to such adoption." This is quite clear in view of sect. 24 of the schedule of that Constitution, which provides : " Nothing contained in this Constitution shall be so construed as to deprive the General Assembly of the power to authorize the city of Quincy to create any indebtedness

for railroad or municipal purposes, for which the people of said city shall have voted, and to which they shall have given, by such vote, their assent, prior to the thirteenth day of December, in the year of our Lord one thousand eight hundred and sixty-nine : *Provided,* that no such indebtedness so created shall, in any part thereof, be paid by the State, or from any State revenue, tax, or fund, but the same shall be paid, if at all, by the said city of Quincy alone, and by taxes to be levied upon the taxable property thereof : *And provided further,* that the General Assembly shall have no power in the premises that it could not exercise under the present Constitution of this State."

The Supreme Court of Illinois, in *Q. M. & P. R. R. Co. v. Morris,* 84 Ill. 410, had occasion to consider the scope and effect of that section. In that case an election was held Aug. 7, 1869, under the authority of a resolution of the city council, to take the sense of the people upon a subscription to the capital stock of the Quincy, Missouri, and Pacific Railroad Company, also a Missouri corporation, whose road lay wholly within that State. That election was held without any law authorizing a vote on the question, or empowering the city to become a stockholder in that company. But by an act passed July 1, 1871, after the Constitution of 1870 went into operation, the city of Quincy — subject to the terms and requirements embodied in the proposition submitted to the people — was authorized to make, upon such conditions as the city council deemed best, a subscription to the stock of that company, for which the people may have voted prior to the thirteenth day of December, 1869. The act further provided : " Any election held in said city prior to said day, for the purpose of such vote being taken, and any contract or subscription made, or to be made, by said city to the capital stock of said railroad company in pursuance thereof, and any bonds or other evidences of such indebtedness issued or to be issued by said city, are hereby declared valid." Under that act the subscription was made and bonds issued ; and the controlling question was as to their validity. The court — waiving any expression of opinion as to the validity of that part of the act which in terms purported to legalize the election — decided : That the obvious effect and intent of the twenty-fourth section of the

schedule of the Constitution were to leave the action of the city of Quincy, in assuming, by vote prior to Dec. 13, 1869, to create indebtedness for a railroad subscription, and the power of the legislature over it, " unaffected by the Constitution of 1870 ; in other words, to leave the vote and the power of the legislature to confer the right to take stock precisely as they would have been under the Constitution of 1848 ; " that the city council were the corporate authorities of Quincy, upon. whom, within the meaning of the Constitution of 1848, the legislature could confer, without the intervention of a popular vote, authority to make the subscription and issue the bonds ; that sect. 24 of that schedule embraced a vote taken without authority of law, prior to Dec. 13, 1869, because, had the vote been legal, the language, " for which the people of said city shall have voted, and to which they shall have given, by such vote, their assent," would have been unnecessary in view of the proviso in the general section forbidding municipal subscriptions in aid of railroad corporations ; lastly, that the construc-- tion of the Quincy, Missouri, and Pacific Railroad, although no part of it lay in Illinois, was a corporate purpose of the city of Quincy, because thereby its trade and commerce were increased, its property enhanced in value, and its welfare promoted.

3. It remains to inquire as to the authority of the city, under the Constitution of 1848, to issue the bonds in question. Its power to do so is denied upon these principal grounds : 1. That the election held under the sanction of the city council, and the action of that body in directing the subscription to be made, were of no legal effect, since the election was held without authority of law, and the subscription was made when there was no legislative authority to create such indebtedness. 2. That without such authority no subscription could be legally made. 3. That the curative act of March 27, 1869, was invalid, because it assumed to impose indebtedness upon the city without the consent of its corporate authorities. The soundness of the first and second of these propositions cannot be disputed, whether reference be had to the decisions of this court or to those of the Supreme Court of Illinois.

But we are unable to concur in the suggestion that the corporate authorities of Quincy did not, after the passage of the

act of March 27, 1869, have authority to issue these bonds. In support of the position taken by the city, counsel refer to numerous decisions of the Supreme Court of Illinois construing the fifth section of the ninth article of the Constitution of 1848, which provides that " the corporate authorities of counties, townships, school districts, cities, towns, and villages may be vested with power to assess and collect taxes for corporate purposes." From those decisions the following propositions, among others, may be deduced : That the clause was intended to define as well the class of municipal officers upon whom the power of taxation, for local purposes, might be conferred, as the purposes for which such power could be constitutionally exercised ; that by the phrase " corporate authorities " must be understood those municipal officers who were selected with some reference to the creation of municipal indebtedness, and who were either directly elected by the population to be taxed, or appointed in some mode to which they have given their assent ; that the construction of a railroad, at least one within or near a county, township, town, village, or city, was a corporate purpose of such municipality ; and that a debt for a subscription to the stock of a railroad corporation, or for bonds in payment thereof, could not be imposed upon a municipal corporation without the consent or against the will of its corporate authorities. But it has been quite as distinctly ruled by the Supreme Court of Illinois, that the city council, and not the voters, of an incorporated city were its corporate authorities within the meaning of the Constitution of 1848, and, if empowered by legislative enactment, could, under that instrument, subscribe to the stock of a railroad corporation, and issue bonds in payment thereof, without submitting the matter to popular vote. Such was the decision in *Q. M. & P. R. R. Co.* v. *Morris,* where the court reaffirmed the ruling upon this point in *Keithsburg* v. *Frick,* 34 Ill. 405, 421. In the latter case, a subscription made by a town to the capital stock of a railroad corporation — without authority of law, as was alleged — was, by an act passed after the town was incorporated under a special charter, declared to be legal, and bonds authorized to be issued therefor. The court said : " It is by no means a necessary element in these subscriptions that there

should be a vote of the inhabitants of the town or city authorizing them. It is competent for the legislature to bestow the power directly on the corporation without any intermediary, as they did in this case." In *Marshall* v. *Silliman*, 61 Ill. 218, 225, the right of the legislature to grant such an authority to the trustees of an incorporated town was conceded. And in *Williams* v. *Town of Roberts*, 88 id. 11, 21, the court, speaking by Scholfield, C. J., said: "County boards, such as boards of supervisors, county commissioners, &c., and the municipal authorities of incorporated cities, towns, and villages, may, when empowered so to do by proper legislation, subscribe for the capital stock of railroad corporations without first submitting the question to the electors of the municipality. They are elected as representatives of the electors, and theoretically, in appropriate cases, their acts are the acts of those they represent. Hence it has been held, where a vote of the electors has been required as a precedent condition to the making of a subscription for stock in a railroad company, and the law prescribing the mode of calling and holding the election has not been observed, inasmuch as the legislature might have empowered the municipal authorities to make the subscription without first submitting the question to the electors, it may, by a subsequent enactment, declare the non-compliance with the law in the holding of the election of no consequence, and validate the subscription, — in other words, validate the subscription without reference to the election. This, however, it will be observed, is upon the theory that power to make the subscription does not in any degree necessarily depend upon a vote of the electors of the municipality upon that question, but solely upon the will of the legislature."

The authorities to which we have referred sustain the judgment against the city. This case is clearly distinguishable from those in which the legislature has attempted to impose upon a municipal corporation, without the consent of its corporate authorities, an indebtedness for subscription to the capital stock of a railroad corporation.

The cases mainly relied on by counsel for the city are those in which certain officers of limited authority were, in terms or in effect, required by legislative enactment to issue bonds or incur indebtedness in the name of a municipality, without the

consent, expressed in legal form, of those who were, in the constitutional sense, its corporate authorities. Here there can be no question but that the city council are the corporate authorities of Quincy. And there is no ground whatever upon which to rest the suggestion that the indebtedness was created without their consent. In no just sense were they compelled to issue bonds in exchange for stock in the railroad company. If, as claimed by the city, the act of March 27, 1869, was inoperative in so far as it assumed to legalize and confirm what had been previously done without the sanction of law, nevertheless by that act it was intended to confer upon the city council power, in execution of the expressed will of the voters, to issue bonds to the amount of $100,000 for stock in this railroad company. The vote of the electors, we have seen, was not essential to the validity of bonds issued, under legislative sanction, by the corporate authorities of the city. The city council was not required or directed, but only empowered to proceed as if they had been originally invested with authority to make the subscription. The legislature, in substance, declared, as it might constitutionally have done, that the corporate authorities of the city had its consent to issue bonds to be exchanged for stock in the railroad company. If the corporate authorities could have been compelled by legal proceedings to issue the bonds, that is only another form of saying that the curative act was constitutional, and, consequently, that the bonds are valid. If, however, they could not have been so compelled, then the execution and delivery of the bonds, under the authority of the act of March 27, 1869, was a voluntary creation of indebtedness for a corporate purpose by the corporate authorities of the city.

What has been said disposes of all the questions certified, including that one relating to the coupon of a bond delivered to the railroad company after the Constitution of 1870 went into effect. In *Q. M. & P. R. R. Co.* v. *Morris* all the bonds there involved were executed and issued under an act passed in 1871. They were sustained upon the ground that the validity of that act depended upon the power which the legislature possessed under the Constitution of 1848. That decision, it would seem, determines the present case as to the coupon of the bond delivered in November, 1870.

*Judgment affirmed.*