8540

*IN RE EVANS.*

1. ATTORNEYS—INFORMATION—VERIFICATION.—The general rule is that an attorney should not have his office and character put in issue on unverified charges. But when the charges are made by a bar association or by the Attorney General in his official capacity, and the charges are grave and require investigation in the public interest or in vindication of the accused, verification of the information may be omitted.

2. Ibid.—Ibid.—Ibid.—Where an attorney by his return admits the material allegations of the information and endeavors to justify his conduct by alleging additional facts tending to exculpate him, the rule requiring the information to be verified does not apply.

3. Ibid.—The presumption is that inquiry into the character of an applicant for admission to the bar is then made, and charges of misconduct previous to that date will not be considered in disbarment proceedings, in the absence of allegations that such conduct was then concealed from or unknown to the Court.

4. Ibid.—Upon finding by the Court that an attorney has misappropriated funds collected by him for his clients and failed to pay them over after repeated demands; that he without justification publicly asserted that other citizens were guilty of specified acts of larceny and arson; his license is revoked with permission to apply for reinstatement after two years, upon satisfactory proof that he has not for two years immediately preceding his application used intoxicant liquors and has reformed his character.

5. Ibid.—Disbarment.—A license to practice law is a declaration by the Court that it has satisfied itself by careful inquiry and examination that the licensee is a person of such attainments and character that he may be trusted by the public. Proceedings to disbar a lawyer are undertaken by the Court for the purpose of ascertaining whether the lawyer accused is no longer worthy to bear the Court's *imprimatur*.

Information by the Attorney General, J. Fraser Lyon, charging B. B. Evans with conduct requiring his disbarment.

*Solicitor W. Hampton Cobb,* for the State.

*Messrs. S. P. Sanders* and *P. H. Nelson,* for Mr. Evans.

*Mr. Sanders* cites: *The facts must be proved beyond a reasonable doubt:* 16 S. C. 435; 37 S. C. 468; 83 Am. St. R. 803; 64 S. C. 461; 89 S. C. 362. *Conduct to disbar must lead to a bad or fraudulent motive:* 64 S. C. 461; 66 Pac. 545; 86 Ill. 151; 109 Pac. 260; 40 L. R. A. 805.

*Mr. Nelson* cites: *Information should be sworn to:* 2 Am. St. R. 858, note; 9 Wheat. 529; 32 Ark. 157; 4 Cyc. 913; Weeks on Attys. 180; 64 S. C. 476.

May 9, 1913. The opinion of the Court was delivered by

MR. JUSTICE WOODS, *Acting Chief Justice.* This proceeding, involving an inquiry by the Court into the character and conduct of Barnard B. Evans, an attorney, was instituted under an information filed on the 6th day of January, 1913, by Honorable J. Fraser Lyon, then Attorney General of the State, charging that the respondent, B. B. Evans, had been guilty of a number of dishonest transactions, and of malicious slander of several persons; that he had been indicted by a grand jury for forgery, and that his reputation for honesty and veracity was bad. The information alleged that the respondent was admitted to the practice of law on the 10th day of March, 1902, and some of the transactions charged against him were alleged to have taken place before that time. In obedience to the Court's order, Mr. Evans filed his return, in which he set out, by way of defense, his version of the facts which occurred after his admission to the bar.

In the return two legal positions were submitted which were decided by the Court before entering upon the trial of the issues of fact. The first was that the whole proceeding should be quashed because the information was not verified by the oath of the Attorney General, and was not founded on the resolution of any bar association of which the respondent was a member, or upon the presentment or true bill of a grand jury. The Court, with the dissent of two of the Justices, denied the motion to quash the information, on this reasoning: The general rule is that an attorney should not have his character and office put in issue on unverified charges. *Ex parte* Burr, 9 Wheat. 529; Weeks on Attorneys, sec. 83; *Burns* v. *Allen*, 2 Am. St. Rep. 858, note. But in the leading case of *Ex parte* Wall., 107 U. S. 265; 27 L. Ed. 551, it was distinctly held that the rule is not inflexible, and it will be varied according to the circumstances when full notice and oppor-

tunity to be heard is given to the accused.  The rule may, with entire propriety, be departed from when it appears that the charges are made by a bar association or by the Attorney General in his official capacity, and that the charges are grave and require investigation in the public interest or in vindication of the accused.  In this case, not only were charges of a serious character made by the Attorney General of the State, but when the motion was made to quash, the respondent, by his return, had admitted the material allegations of fact made in the information, and had endeavored to justify his course by alleging additional facts which, if proved, would have tended to exculpate him.  When the issues of fact and law had been thus joined, the rule requiring verification of the information disappeared.

On the second point, the Court refused to consider charges of misconduct in transactions occurring before the respondent was admitted to the bar, for this reason: The information contained no statement that the alleged discreditable transactions were concealed from the Court or were unknown to the Court when the respondent was admitted to the bar.  The presumption is that the Court inquired into his character before his admission, and that the delinquencies alleged against him were not proved, or that he had redeemed his character by subsequent repentance and good conduct.

After disposing of the legal questions in the manner indicated, the Court entered upon the investigation of three specific charges against the respondent:

First, the indorsement and appropriation to his own use by respondent of a check, payable to George L. Salter, which respondent had received as attorney for Salter.

Second, application to his own use of money collected as attorney for the Murray Drug Company on a claim against T. E. Dowling.

27—94

Third, stating maliciously and falsely at a public meeting in Spartanburg that E. W. Able and B. W. Crouch, two attorneys of Saluda, were blind tigers, thieves and incendiaries, "that one of the parties was caught in the act and compromised and the other had destroyed all the libraries of the lawyers in Saluda;" and in making, with malicious intent, the false statement that B. F. Sample, sheriff of Saluda county, had stolen a receipt from respondent's office in Saluda.

The first charge was proved beyond all dispute. George L. Salter, a farmer of Edgefield, applied to J. Frank & Son, of Augusta, Georgia, through respondent for a loan of $1,000.00 on a mortgage of his land. The application was accepted to the amount of $650.00 and the loan made. Frank & Son paid up a senior mortgage and sent to respondent a check on the Union Savings Bank of Augusta, dated October 17, 1906, payable to Geo. L. Salter, for $198.90, the supposed balance of the loan. The respondent, Evans, indorsed this check, "Geo. L. Salter, by B. B. Evans, attorney in fact," and delivered it to J. J. Robertson, of Columbia, receiving from him the full amount called for. The check was indorsed by Robertson and paid by the drawee bank October 26, 1906. Evans did not pay the money to Salter, though payment was several times demanded of him, but afterwards gave Salter as payment his own check on Bank of Johnson for $200.20, which was protested for lack of funds. The notice of protest indicates that this check was not given by respondent until March 9, 1907, nearly five months after he had used the check for $198.90. It was never taken up by Evans, nor was the money collected by him on the check for $198.90 payable to Salter ever accounted for to Salter. Subsequently, when Frank & Son were informed that Salter had not received his money, they sent him another check, repudiated the indorsement made by Evans on the original check, and demanded and received repayment from the bank. On the claim by the bank that

Evans had no right to indorse the check, Robertson refunded the money to the bank with whom he had negotiated it. He made several demands on Evans that he repay him the money without receiving any response, and then placed the check in the hands of Mr. George R. Rembert, his attorney. Demands were made on the respondent by Mr. Rembert, with the threat of criminal prosecution, in April and May, 1907, but he still failed to refund the money. Finally, Mr. Rembert brought the matter to the attention of a brother of the respondent and he paid the amount of the check.

All of the above stated facts are established beyond controversy. The explanation and excuse offered by Mr. Evans is that there was error in the check for $198.90; that in his application for the loan Salter had constituted him his attorney in fact to indorse the check and receive the money, and that he did not turn it over to Salter for that reason; but even if he had the authority to indorse the check and receive the money for Salter, that was no excuse for the appropriation of the proceeds of the check. Nor is any excuse to be found in respondent's claim that he gave Salter his own check for $200.20, covering the balance coming to him in the place of the check by Frank & Son for $198.90, for he does not claim that he had funds to meet his check, nor that he has ever offered to pay it. Besides, the protest notice makes it evident that this worthless check was not given until 9 March, 1907, more than four months after he had indorsed to J. J. Robertson the check which he should have turned over to Salter, and had appropriated the proceeds to his own use. It is true the respondent went to Mr. Rembert's office in company with Mr. Robertson, declaring his intention to pay back the money received from Robertson and take up the check, and that he testified that he did not pay because there was no one in the office but a stenographer; but that was after he had disregarded Robertson's letters and had been threatened with criminal proceedings. Besides, this excuse loses all significance in view

of respondent's failure to take any further steps to refund the money.

As to the second charge, the facts are simple. The Murray Drug Company, of Columbia, placed in the hands of respondent, for collection, a debt due by T. E. Dowling for $129.84. The respondent collected, during the year 1905, from Dowling in small payments, for which he gave separate receipts, on the Murray claim, a total of $103.00, and then gave Dowling a general receipt in full of the claim. This money was not turned over to the Murray Drug Company. Upon ascertaining that the respondent had collected $103.00 from its debtor, the Murray Drug Company placed the matter in the hands of Mr. Allen Green, now deceased. Mr. Walter T. Green testified that respondent told Mr. Allen Green in his presence that he had not collected the claim, but had received from Dowling a mortgage covering this debt and several others, and asked that he be paid a fee for foreclosing the mortgage. Dowling testified that he never gave a mortgage for the claims held by the respondent, and that Mr. Evans gave a receipt in full after the payment of $103.00 on the claim of $129.84, saying that he had been authorized to make a discount. Dr. Murray, of Murray Drug Company, testified that he did not authorize settlement for less than the full amount, and that Mr. Evans told him that he had not collected the debt, but had a mortgage to secure it. The matter remained in this condition until, on the affidavit of Dr. Murray, a rule was issued against Mr. Evans in the Circuit Court, and the money was paid by a brother of respondent.

As explanation and excuse, respondent testified that he did take a mortgage from Dowling, which was never recorded; that he had several other small claims against Dowling, and that, while he gave receipts on the Murray claim, the money was actually remitted to the other creditors. He also produced at the trial an account for $100.00 against the Murray Drug Company, one item being a charge

of $25.00 for the collection of the Murray claim, and another of $50.00 for answering a question of law propounded by Dr. Murray at a casual meeting on the street. This account was submitted to the Court and is dated January 13, 1913, apparently after the claim of Dr. Murray had been settled. Mr. John Gary Evans testified that he had paid this claim, as well as the Salter claim, without communicating with the respondent. It is apparent from this statement that the respondent did collect $103.00 for his client, that he misappropriated the money, and, without any just excuse, failed and refused to refund it.

As to the third specification of the information, the return did not deny, and, therefore, admitted the allegation of the information that the respondent had stated in a public speech at Spartanburg that Messrs. Able and Crouch were thieves and incendiaries, "that one of the said persons was caught in the act and compromised, and the other destroyed the libraries of all the lawyers of Saluda;" and that at various times he had averred that B. F. Sample, sheriff of Saluda county, was a thief and had stolen a receipt from respondent's office. But by amendment of his return, respondent denied "that he had made the charges maliciously, because at the time he believed them to be true." On the stand in open Court the respondent reiterated his charge against Sample, giving as the sole foundation that the receipt was among his effects seized by Sample under a distress warrant, and that it had not been returned to him. He testified that he believed the charge against Crouch, because Geo. C. Wheeler and W. J. Padgett told him that they had caught Crouch in the act of setting fire to the house of Geo. C. Wheeler; and that he believed the charge against Mr. Able because Messrs. C. J. Ramage and J. N. Gregory told him that Able burned the lawyers' libraries, and because T. C. Bush had told him that Able had burned his house. All of these persons, except Mr. Gregory, who is dead, appeared and denied that they had ever made such statements to

respondent. Not a particle of testimony was offered, tend-
ing to show that Crouch or Sample was guilty of the heinous
offenses charged against them by respondent. The testi-
mony tending to implicate Mr. Able was not credible, and
there was nothing to show even that was before the respond-
ent when he made the charge. There is no escape from the
conclusion that the charges were false, and that they were
made recklessly and without probable cause.

It is not for this Court to animadvert upon the prevalent
exaggeration and excess in public speech so discreditable and
misleading. Allowance must be made for weak men who
drift with the current into untrue statements, and who
assume one character in private life and another in public
speech. A charge of falsehood against an attorney so weak
as to meet expletive with expletive and excess with excess in
the heat of a political campaign would rarely be considered
by the Courts in disbarment proceedings. But untrue
asseveration made without probable cause in public speech
by a member of the bar that certain citizens have stolen or
burned specific property is a serious offense, going to the
foundation of character, and must be weighed by the Courts,
especially when coupled with other offenses showing a reck-
less disregard of professional duty.

We have not thought it proper to give any weight to the
mere true bill of the grand jury of Saluda county on an
indictment charging forgery, in that the respondent altered
a receipt for papers signed by Sheriff Sample, since the
information did not allege that the charge was well founded,
and the indictment was quashed and the matter thus ended
without trial.

This plain narrative shows that the respondent in two
instances appropriated trust funds to his own use, and failed
to restore them though repeated demands were made upon
him; that he, without justification, publicly asserted that
other citizens were guilty in specific instances of larceny and
arson; that in the trial before the Court, he has presented

mere pretexts as excuses for his conduct; and that on almost every material issue of fact he has been contradicted by other witnesses. The childishness of the excuses and pretexts and excuses offered indicates obsession of moral perception and a lack of capacity to estimate moral values. In addition to this, a number of persons in Columbia and Saluda have testified to the respondent's bad reputation for honesty, while the witnesses who testified in his favor on the issue of character admitted that they had heard unfavorable as well as favorable expressions of opinion.

How did it happen that respondent fell to this low estate? He had the advantages of a rearing gentle and refined; he has been encompassed from his birth with devoted affection; he had a brother ready to come to his relief; he has had all his life the stimulus of descent from families on both sides distinguished and esteemed in the past and now for manly virtues and public services. The Court is of opinion that the reason of his fall may be found mainly in the fact that the respondent is an inebriate. All men know that alcohol may make liars of the truthful, knaves of the honest, ruffians of the gentle, and traitors of the faithful. Under its influence the respondent has in mind and morals staggered along the devious path which leads to the abyss.

It is true that he is now just as unworthy and incompetent to perform the duties of an attorney as if his offenses were due entirely to inherent wickedness; and obviously he will remain so until he changes his habits and reforms his character. Therefore, the Court cannot permit him to exercise the rights of an attorney, or to resume them at any time in the future, until it has had satisfying evidence of redemption in habits and character. But there is a difference in degree between the debasement of the criminal who plans his crime with deliberation, and that of the weak wrongdoer whose character has been wrecked by drunkenness. The probability of reform is also much greater in the latter than in the former cases.

A license from this Court to practice law is a declaration by the Court that it has satisfied itself by careful inquiry and examination that the licensee is a person of such attainments and character that he may be trusted by the public.

Proceedings of this kind against a lawyer are undertaken by the Court for the purpose of ascertaining whether the lawyer accused is no longer worthy to bear the Court's *imprimatur*. When the evidence shows that he is, the Court cannot escape the sad duty of withdrawing its license, either temporarily or permanently, according to the circumstances. The evidence in this case shows that Mr. B. B. Evans was guilty of the wrongs charged against him, and that he is at this time unfit to be entrusted with the issues of life, liberty and property incident to the practice of law.

The Court is of the opinion, however, that the respondent should be allowed the opportunity to reform, and be reinstated upon proof that he has ceased the use of intoxicating liquors, and has redeemed his life in other respects.

It is, therefore, the judgment of the Court that Barnard B. Evans be indefinitely suspended and forbidden to exercise the rights and duties of an attorney in the Courts of this State, or elsewhere under the license of this Court, with the privilege, however, to move before this Court for reinstatement after the expiration of two years upon satisfactory proof that he has not for two years immediately preceding his application used intoxicating liquors, and that he has reformed his character.

MR. SAM J. NICHOLS *sat in place of the Chief Justice, who was disqualified.*