Prettyman v. Supervisors of Tazewell County et al.

BENJ. J. PRETTYMAN, Plaintiff in Error, v. THE SUPERVISORS OF TAZEWELL COUNTY *et al.,* Defendants in Error.

ERROR TO McLEAN.

The Legislature has the constitutional right to authorize counties and cities to aid the construction of railroads, by lending their credit, or by taking stock.

The board of supervisors have authority, under the act which authorizes counties to subscribe for stock in railroad companies, etc., to call an election to ascertain the will of the people in that behalf.

Under the laws incorporating the Tonica and Petersburg Railroad Company, the county of Tazewell is authorized to subscribe more than one hundred thousand dollars in aid of railroads.

A party complaining of fraud in the election, must do so in apt time; if he delays until others have acted, upon the faith that the county will aid the construction of the road, he will be too late in an attempt to enjoin the county.

The certificate of the proper officer as to the result of the election, is *prima facie* evidence of its fairness; but this certificate may be impeached.

Bonds to be issued under these laws should bear date and draw interest, as of and from the time when they should have issued, whether the issuance has been delayed by the officers, or not.

The principal of such bonds should be made payable in the county where issued; the interest may be payable elsewhere.

THIS cause was begun in Tazewell county, and the venue changed to McLean county.

The complainant, in his bill, shows to the court, that he is a citizen of the State of Illinois, and a resident and tax-payer of the county of Tazewell, and as such he is interested in everything done in and by said county which is calculated to affect its welfare or militate against its prosperity, and shows, that, on the — day of —, 1853, the due majority of the legal voters of the county of Tazewell, at an election held by order of the board of supervisors of said Tazewell county, voted for the county of Tazewell to take and subscribe $75,000 to the capital stock of the Mississippi and Wabash Railroad Company, and $25,000 to the capital stock of the eastern extension of the Peoria and Oquawka Railroad Company, and avers, that pursuant to the said vote of said legal voters of said county, the said board of supervisors of said county of Tazewell, did subscribe $75,000 to the capital stock of the Mississippi and Wabash Railroad Company, and ordered the chairman of the board of supervisors to prepare the bonds of the said county, to be delivered over to the said Mississippi and Wabash Railroad Company, in payment of said subscription.

The bill further shows, that on the first day of July, 1857, the said board of supervisors of said county, again ordered an election to be held in said county, on the 22nd day of August, 1857, to vote for or against subscribing $100,000 to the capital stock of the Tonica and Petersburg Railroad Company; and

further shows, that the clerk of the county court of said county certified to the board of supervisors that a majority of the legal voters of said county had voted at said election for said subscription; and shows that said board of supervisors, on the — day of August, 1857, resolved that the clerk of Tazewell county cause $100,000 of the bonds of said county to be prepared, and that he sign the same, and attach the seal of the county thereto, and that the said bonds be signed by the chairman of the board of supervisors of said county, and that *after* the said bonds *were* so *prepared* and *signed,* that the clerk, for and on behalf of the county, subscribe for $100,000 of the stock of said railroad company, and pay for the same in said bonds at par, issuing and paying out the same at such times and in such amounts as other stockholders may be required to pay, and that said bonds should bear date the days on which they should be paid out; said bonds to run twenty-five years from the date thereof, and bear interest at seven per cent. per annum; and shows that, inasmuch as the county of Tazewell had, prior to the 22nd of August, 1857, subscribed $75,000 to the capital stock of one railroad company, and voted to subscribe $25,000 to another, the county of Tazewell had no power or authority to subscribe another $100,000 to the capital stock of any other railroad company, or order the same to be done, or issue the bonds of the county for the payment of the same; and shows that the order of the board of supervisors was to submit the question of said subscription to the capital stock of the Tonica and Petersburg Railroad Company, to the people of said county, and that those favorable to taking the proposed subscription, procured to vote, and to be registered as voters, at said election, hundreds of inhabitants and mere transient men, some of whom were transported thither for the express purpose of voting at said election, and by threats and menacing forbid and prohibited many other legal voters of said county from voting at said election against said subscription; and shows that there was not a majority of the legal voters of said county, who voted in favor of said subscription to the capital stock of the Tonica and Petersburg Railroad Company.

Complainant then charges that the constitution of the State forbids the State to give credit in *any manner* to aid any corporation, and submits that the legislature had no power to authorize a county to issue bonds to aid a corporation, or levy a tax on the inhabitants to pay the same, and charges that there was not and is no law, authorizing the board of supervisors to order said election in August, 1857, as aforesaid, in said county, for the purpose of deciding whether the county would subscribe said $100,000 to the capital stock of the Tonica and Petersburg

Railroad Company, nor to order or make said subscription of $100,000 to said capital stock of the Tonica and Petersburg Railroad Company, nor to issue the bonds of the county for the same, nor to pledge the faith of the county for them; and charges that the board of supervisors, knowing they had, by law, no power or authority to cause said election to be held, said bonds to be issued, or said subscription to be made, colleagued and combined with the Tonica and Petersburg Railroad Company, and the clerk of the board of supervisors; and, notwithstanding the bonds were not prepared and signed by the chairman of the board of supervisors, pretend to have procured the said clerk to make the said subscription of $100,000 to the capital stock of the Tonica and Petersburg Railroad Company, for and in the name of said county, and to prepare the bonds of said county, with the provision therein contained that the interest thereon should be payable semi-annually on the first of April and October in each year, while the resolution requiring the preparation of the bonds and making subscription, provides the bonds shall bear date when they were paid out, and interest should be paid semi-annually thereon, and that subscription should be made only when the bonds were duly prepared and signed by the chairman of the board of supervisors, which is not yet done; and avers that the clerk, without any authority of law, or order of the board, did prepare said bonds, and stipulate therein that both the principal and interest thereon should be paid at the American Exchange Bank, in the State of New York; charges that the chairman of the board of supervisors, because the bonds were improperly prepared, and not in accordance with the order of the board or the vote of the people, refused to sign them; and avers that the supervisors afterwards, on the 7th of November, 1857, procured and resolved that J. S. Marsh sign the bonds, in lieu of the chairman of the board; and avers and charges that all the bonds were dated December 1st, 1857; and charges that $10,000 of said bonds, bearing date December first, 1857, were, on the 5th day of December, 1857, signed by said J. S. Marsh and by the said clerk, and on the said fifth day of December, 1857, paid out to said Tonica and Petersburg Railroad Company, and delivered over to said Henry R. Green for their use and benefit, although complainant charges that no subscription has ever been made to the capital stock of the Tonica and Petersburg Railroad Company; and avers that the bonds are still in the hands of Green or the Company; and avers that the making the bonds payable in New York, costs the county $13,000; and charges that Marsh and the clerk are about to sign, seal and deliver over all the remainder of the bonds to the Tonica and Petersburg Railroad Com-

Prettyman *v.* Supervisors of Tazewell County et al.

pany, prepared, dated and signed as those already delivered; and avers the company design and are about disposing of those bonds to innocent holders, and place them out of the reach of the county, greatly to the prejudice of the county, and to the injury of all the inhabitants, and promotion of endless litigation. And as complainant is remediless except in a court of equity, prays process against all the defendants, and that they and each of them, and their servants and agents, be forever enjoined from subscribing to the capital stock of the Tonica and Petersburg Railroad Company for the county, or issuing bonds, or paying out the same for stock in the Tonica and Petersburg Railroad Company, or transferring the same, or in any way pledging the credit of the county in any manner to or for anything appertaining to said company, or to the capital stock thereof, etc.

The court directed the clerk to issue an injunction, according to the prayer of the bill.

Orders in reference to holding an election :

*Resolved,* That the clerk of the County Court be authorized to issue notices for an election to be held on Saturday, the 22nd day of August next, for the purpose of submitting the question to the people of Tazewell county, will subscribe $100,000 to the capital stock of the Tonica and Petersburg Railroad Company.

*Resolved,* That the proposed subscription be made by issuing the bonds of Tazewell county, said bonds to run for the period of twenty-five years, and draw interest at seven per cent. from date, payable semi-annually.

Whereas, at an election held in the county of Tazewell and State of Illinois, on the 22nd day of August, 1857, for the purpose of deciding whether or not the county of Tazewell would take stock in the Tonica and Petersburg Railroad Company, to the amount of $100,000; and whereas, it was decided at said election, by a majority of the legal voters of said county, taking the votes cast at the last general election as the basis of calculation, to take said stock, and issue bonds of said county for the same amount, payable in twenty-five years, with semi-annual interest at the rate of seven per cent.; therefore

*Resolved,* That the clerk of Tazewell county be hereby authorized, empowered and directed to procure said bonds, with suitable coupons, and that said bonds when so prepared, be filled up and signed by the clerk, and sealed with the seal of said county, and dated on the day or days when they shall be paid out; and the bonds shall be signed by the chairman of the board of supervisors.

*Resolved,* That as soon as said bonds shall be prepared as aforesaid, the clerk of the county, for and on behalf of the county of Tazewell, shall subscribe for $100,000 of stock of said railroad company, and pay for the same in said bonds at par, issuing and paying the same to said company at such times and in such amounts as other stockholders may be required to pay.

The clerk prepared bonds, which the chairman refused to sign because they were irregularly and informally prepared, and gave reasons, among others, that as prepared they would cost the

27

county $13,750 more than if prepared according to the resolu-
tion of the board; that the interest is not made payable as
required, and that the record and laws printed on the back of
the bonds were not true copies.

And the board of supervisors thereupon resolved:

Whereas, the bonds to be issued to the Tonica and Petersburg Railroad Company,
  already procured by the clerk of Tazewell county, are insufficient and informal;
  therefore be it

*Resolved,* That the clerk of said county be hereby authorized, empowered and
  directed to procure some blanks of bonds and coupons, to be prepared as soon as
  may be, at the expense of said county, making said bonds and coupons payable
  at the American Exchange Bank, in the city of New York.

Whereas, by a resolution of this board, passed at the August term, 1857, the
  chairman of the board was directed to sign the bonds of the county to the
  Tonica and Petersburg Railroad Company, and has not obeyed the order of the
  board; therefore

*Resolved,* That so much of the resolution as directs him to sign the said bonds,
  be and is hereby rescinded, and J. L. Marsh be and is hereby authorized and em-
  powered to sign the bonds of the county, in the place and stead of the chairman.

The joint and separate answer of the Tonica and Petersburg
Railroad Company, the Board of Supervisors of Tazewell county,
and Henry R. Green, to the bill, is as follows:

To all that part of said bill which charges that no subscription
had ever been made by said county of Tazewell to the capital
stock of the Tonica and Petersburg Railroad Company, say that
said county did, on the        day of                  A. D. 1857,
and long before the issuing of the bonds as set forth in com-
plainant's bill of complaint, subscribe $100,000 to the capital
stock of said Tonica and Petersburg Railroad Company, in pur-
suance of the order of the board of supervisors of said county
of Tazewell, and in due form of law; and they therefore deny
that said allegation in said bill is true.

The court made a decree dissolving the injunction and dis-
missing the bill at costs of plaintiff.

B. S. PRETTYMAN, for Plaintiff in Error.

WEAD & WILLIAMSON, for Defendants in Error.

WALKER, J.  The first question we propose to consider, is
whether the legislature has constitutional power to authorize
counties and cities to subscribe for shares of the capital stock of
railroad companies.  To determine the question satisfactorily,
it will be proper to ascertain the true rule of construction to be

applied in testing the constitutionality of an act of the State legislature. While the federal government is one of delegated powers, supreme to the extent of the power granted, that of a State is rather to be regarded as a limitation of the legislative department, and it is competent for the legislature to exercise all powers not forbidden by the constitution of the State, nor delegated to the general government, nor prohibited to the State by the constitution of the United States. *Sawyer* v. *City of Alton*, 3 Scam. R. 130 ; *Mason* v. *Wait et al.*, 4 Scam. R. 134. This court again say, " that in determining a question involving the inquiry whether an exercise of power by the legislative department of the State is constitutional, is readily conceded to be not only a matter of delicacy, but of grave import, and demands the most deliberate and mature consideration. It should not, moreover, be decided but in cases of clear necessity, and when the act done is in plain conflict with the constitution." *Lane* v. *Dorman*, 3 Scam. R. 240.

These, it is conceived, are the true rules by which to test the validity of the exercise of the legislative power of a State; and, applying these tests, we will proceed to determine whether the acts in question are prohibited by the constitution. The only portion of our State constitution referred to as violated by the act of the 6th November, 1849, is the 38th Sec. of the 3rd Art. of the constitution, which provides that " the credit of the State shall not be given to, or in aid of, any individual, association, or corporation." From the terms used in this provision, or from plain and necessary implication, does it appear that the framers of that instrument intended to prevent the legislature from authorizing counties and cities to subscribe for shares of the capital stock of railroad incorporations? The language, in terms, does not. The credit of the State alone is mentioned; counties and cities are not named. It is a familiar rule of construction, that the express mention of one thing, implies the intention to exclude others. Co. Litt. 210 a; Broom's Max. 505. It is no more than reasonable to suppose, that if the framers of the constitution had intended to embrace counties and cities in this prohibition, they would have named them, and especially so when they have been so specific in regard to the great number of prohibitions enumerated in that instrument. I have been unable to find a single decision holding a legislative enactment void because it authorized the performance of an act supposed to be embraced within the reason of some other prohibition, and it is believed that none such exists. Such a reason would be highly proper to urge in favor of a change of the fundamental law, or upon the legislature, to prevent them from exercising the power. But the constitution itself furnishes the only test

in determining the validity of a statute. Any other would be dangerous in the extreme, as the courts would then be virtually the framers of the constitution, and not the people. It is the duty of the courts to determine what the provisions of the constitution are, and not what they should have been. If a law is unwise, the legislature is responsible, and it is for their constituents to apply the corrective, and not for the courts, for that reason, to hold it void. We can only look to their power to act, under the constitution, and not to the effects of their exercise of constitutional authority, in determining the validity of their acts. It was urged, that under this prohibition the State has no power to subscribe for stock in such an incorporation, or to levy a tax to aid its construction, and that to authorize counties or cities to do so, was indirectly doing the same thing. It certainly has the power to authorize individuals to subscribe for such stock, although it is itself prohibited from doing so. There are many acts it may not do, and yet may authorize others to do. It has no power to try a suit, yet it may authorize a a court to do so; and may not exercise many judicial, ministerial and executive acts, which it may authorize others to perform. The act in no way lends the credit or pledges the faith of the State to these incorporations. It is not responsible for the redemption of the bonds, or for the payment of the interest on them. It only authorizes counties and cities to lend their credit to, or in aid of, such incorporations. And we think that the legislature had constitutional warrant for so doing, and the act is not void.

It was urged, that this act authorizing counties to subscribe for stock in railroad companies, does not confer power on the board of supervisors to call an election, to subscribe for stock, or to issue the county bonds. The 5th clause of the 4th section of the 16th article of the act authorizing counties to adopt township organization, (Sess. Laws 1851, p. 51,) has this provision : " That the board of supervisors of each county in this State shall have power, at their annual meetings, or at any other meeting, to perform all other duties not inconsistent with this act, which may be required of, or enjoined upon them by any law of this State, to county courts." The calling an election when desired by the people, the subscription for stock, and the issuing of county bonds, were duties enjoined on county courts by the laws of this State, and such duty was not inconsistent with that act. Under this provision, the board of supervisors clearly had the right.

It was urged, that under the act of November 6, 1849, no county has the right to subscribe more than one hundred thousand dollars for railroad stock, and Tazewell county having

already subscribed that sum, to other roads, that this subscription is void. The act amendatory to the charter of the "Tonica and Pittsburg Railroad Company" (Private Laws 1857, sec. 1, p. 1031) provides: "That in all cases where subscriptions have been or shall be made to said company, by any county of this State, in pursuance of a vote of the county, (all which are hereby declared legal and valid,) it shall be the duty of the County Court of each county respectively, to levy a sufficient tax," etc. If there had been no prior legislation authorizing counties to subscribe, this enactment would have authorized the county to subscribe for stock in this road, and the only condition imposed would have been that it should be in pursuance of a vote of the county, and without limitation as to amount. If, then, it would have conferred the power to subscribe any amount the county might determine, had there been no former legislation on the subject, it would seem to follow that any limitation as to amount, by former enactment, could not control, as no reference is made to such prior law. The language is broad and comprehensive. It embraces all subscriptions which have been or shall be made by any county, and they are declared legal and valid on the sole condition that it is in pursuance of a vote of the county; and it is not declared that it shall be in pursuance of the former legislation. We are, therefore, of the opinion this provision authorized this subscription, whether the act of 6th November, 1849, did so or not.

It was urged that unfair practices were resorted to by a portion of the citizens of the county, who were favorable to subscription, for the purpose of carrying the vote at the election in its favor. The bill alleges that "they caused to vote hundreds of inhabitants, and mere transient men, some of whom had been transported thither for the express purpose of voting at said election, and for subscription, and who were not legal voters of said county, and forbid and prohibited, by threats and menaces, other legal voters of said county from voting at said election, who desired to vote against said subscription; and your orator shows there was not a majority of the legal voters of said county who voted in favor of said subscription." This allegation is not specific. It nowhere in terms charges that any portion of these illegal votes were cast in favor of this subscription. It only charges that the friends of subscription caused them to vote at the election, and that a portion of them were brought there to vote in its favor. There is no averment that, if every illegal vote cast had been rejected, the result would have been different. It is true, that it is alleged that a majority of the legal voters of the county did not vote in favor of this subscription.; but this allegation does not aid the other. This may be true,

and still the subscription valid. For anything appearing, there may have been a decided majority of the legal votes cast that were favorable to subscription; and still, those voting in its favor might have been a majority of all the legal voters of the county. If tested by the act of 6th of November, 1849, it will be found that the bill does not negative the fact that there was a majority as required by its provisions. That act provides, that to ascertain whether the proposed subscription has a majority of the legal voters of the county, the vote of the last general election shall be taken as the basis. This bill nowhere alleges that the subscription in this case did not have a number of legal voters of the county voting for it, more than equaling half of the number of votes cast in the county at the last preceding general election. The number of votes given for or against this subscription, whether legal or illegal, is not given; nor is the number of votes cast at the preceding election. In this, as in all other elections, the certificate of the canvassing officer is binding until it is impeached, and that officer has certified that there was a majority of the legal voters of the county who voted for subscription. This certificate, undoubtedly, might be impeached for fraud, upon establishing a proper case, in apt time. But justice and reason would alike prohibit a party, after acquiescing until the road should incur liabilities, acquire credit, or procure individual subscriptions on the faith that these bonds would issue, from impeaching the election and enjoining them from issuing. If fraud existed, the party must have known it, and should have proceeded at once to enjoin proceedings; but having delayed for near four months, the presumption is, that rights have been acquired and liabilities incurred, on the faith of these bonds, that would make it inequitable to restrain their issue, although fraud in the election may have existed. If he has delayed until others acting in good faith have acquired rights, he has no right to complain if they are preferred.

Another objection urged is, that these bonds bear date and draw interest before it is proposed that they shall be delivered to the railroad company. The act of November, 1849, requires them to issue at the same times, and in the same proportions, that individual subscribers shall be required to pay their subscriptions. The act of the 1st of March, 1854, authorizes the County Court to issue all or any portion of such bonds, whenever they shall deem it for the interest of the county, without reference to other subscriptions. When the county propose to issue the bonds under one or the other of these acts, they should bear date and draw interest from the time they should issue. And the neglect or failure of the officers of the county to per-

form their duty in issuing them, should not prevent the bonds from drawing interest from that time.

The only remaining question is, whether the county has the power to make the principal of these bonds payable at any other place than at its treasury. This is determined by the 3rd section of the act of 16th February, 1857, (Private Laws, 1,032,) which provides, " That the County Court of each county, which may, by a vote of said county, have subscribed, or may hereafter subscribe, to the capital stock of said company, is hereby authorized to make the interest on the bonds of subscription aforesaid, payable at such place or places as the said County Courts, respectively, may order and determine." This enactment only authorizes the courts to make the interest payable where they may order, but gives no such power as regards the principal. When the legislature expressly mention the interest alone, the inference is strong that they intended to exclude the principal from that provision. If the interest were payable at the county treasury, bond holders would be subjected to the inconvenience and expense of semi-annually applying in the county for their interest. This would necessarily depreciate the market value of these bonds, while, merely having to present the bonds there at their maturity, would not have that effect. These were probably the reasons that induced the legislature to make the distinction. We are, therefore, of the opinion that the Circuit Court erred in dissolving the injunction and dismissing the bill. The decree of the Circuit Court is reversed, and the cause remanded, and the court is directed to enter a decree perpetually enjoining the defendants from issuing the bonds described in complainant's bill.

*Decree reversed.*