RAPPAPORT V. DEPARTMENT OF PUBLIC HEALTH AND HOSPITALS OF THE CITY OF INDIANAPOLIS ET AL.

[No. 28,534. Filed July 5, 1949.]

510

Emmert, J., dissents with opinion.

*Leo M. Rappaport;* and *Rappaport, Kipp & Lieber,* all of Indianapolis, for appellant.

*Louis A. Weiland* and *Owen S. Boling,* both of Indianapolis, for appellees.

*Robert D. McCord* and *Harry T. Ice;* and *Ross, McCord, Ice & Miller* (of counsel), all of Indianapolis, *amicus curiae.*

YOUNG, J.—This action was brought by the appellant, a taxpayer in the City of Indianapolis, for himself and in behalf of others similarly situated. The defendants were the Department of Public Health and Hospitals of the City of Indianapolis, and five individuals, constituting the Board of Public Health and Hospitals of the City of Indianapolis, and the secretary of such board. The appellees, acting pursuant to ch. 200 of the Acts of 1945, as amended by ch. 323 of the Acts of 1947 (§ 48-8401, et seq., Burns' 1933), had taken the preliminary steps to build additions and improvements to the Indianapolis City Hospital and to issue $2,600,000 of bonds to defray the cost of these new facilities. The purpose of the action was to enjoin the appellees from letting contracts for, or issuing bonds to defray the cost of, such additions and improvements. Appellant contends that the issuance of such bonds will constitute an evasion of the debt limitation imposed upon the City of Indianapolis by Art. 13 of the Constitution of Indiana, which reads as follows:

"No political or municipal corporation in this State shall ever become indebted in any manner or for any purpose to an amount in the aggregate exceeding two per centum on the value of the taxable property within such corporation, to be ascertained by the last assessment for the State and county taxes, previous to the incurring of such indebtedness; . . ."

There is no conflict in the evidence or controversy about the facts which are material in a decision of this case. The regularity of the proceedings of appellees is not challenged. The sole question is whether or not the Act of 1945, as amended in 1947, and the challenged proceedings of the Department of Public Health and Hospitals of the City of Indianapolis, organized thereunder, are constitutional.

Historically the functions of the civil cities of the state have included matters pertaining to public health and hospitals. This has been true legislatively and in actual practice at least since 1852.

Chapter 17 of the Revised Statutes of Indiana of 1852 is entitled, "An Act for the Incorporation of Cities." It was approved June 18, 1852, and was among the first legislative acts under our present constitution. Section 35 of this act vests in the common council of cities the power to pass ordinances for stated purposes. Among them, under sub-head 34, was the power "to establish a Board of Health and invest it with necessary powers." 1 Revised Statutes of 1852, p. 211. There were amendments to this act from time to time up to 1881, none of which took from cities the right to have a board of health. Section 3106 of the Revised Statutes of 1881, sub-head Thirty-five, provided that the councils of the several cities of the state should have the power to establish boards of health and invest them with necessary powers to attain their objects.

The cities and towns act of 1905 (Acts of 1905, ch. 129), provided that the councils of the several cities should have the power "to establish, maintain and regulate . . . pest-houses, hospitals, dispensaries, . . ." § 48-1407, Fifty-first clause, Burns' 1933.

The Act of 1905 (§ 213), further provided that in every city of the state there should be a department of health and charities, to be under the control of a board of three commissioners, known as a Board of Health, and also provided that this board should have charge of the city hospital and dispensary and the sanitary affairs of the city and appoint the superintendent of the city hospital, § 48-7401, Burns' 1933.

In 1913, the legislature passed an additional act, specifically giving the Board of Health of cities of the first class the power "to acquire, lay out and improve land for public hospitals, dispensaries and such other purposes as may be necessary for the administration of the duties or works of the department; and to govern, manage, maintain, regulate and direct the use of same, and to make rules and regulations for their proper management and government." § 48-7403, Burns' 1933. And in addition, a special tax not to exceed twelve cents on each $100 of taxable property was authorized for the use of the board. There was no other legislation germane to the subject matter of this case until the Act of 1945, heretofore referred to. It appears, therefore, that continuously from 1852 to 1945 boards of health with necessary powers to attain their objects, including the establishment, maintenance and operation of hospitals, have been constituent parts of our city governments.

Chapter 200 of the Acts of 1945, created in cities of not less than 300,000 population a Department of Public Health and Hospitals, and transferred to this new de-

partment all the rights, powers and duties conferred by existing laws on the Departments of Health and Charities, the Boards of Health, and kindred agencies of the several cities of the state of not less than 300,000 population, which included responsibility for the operation of the city's existing hospital and health agencies. It was provided that the new department should be under the general control of a Board of Public Health and Hospitals, the members of which, five in number, were to be appointed by the mayors of the several cities, and among the powers given to such new Board of Public Health and Hospitals was the power "to operate, maintain and construct such hospitals, clinics, health centers and dispensaries as may, in the judgment of the board, be needed to carry out the purposes and intent of the Act." The Act of 1945 (§ 16), as amended in 1947, establishes a Public Health and Hospitals District in each city of the state having a population of more than 300,000, such district to include all the territory within the corporate limits of any such city, and the territory of any incorporated town lying within the corporate boundaries of such city, and it was provided that upon request of the proper officers any governmental unit, recognized or established by law other than for school purposes within the county, may, upon request of such unit, be incorporated into such district by the Board of Public Health and Hospitals. It is further provided that taxes to pay the general expenses of the new Board of Health and Hospitals, including the cost of operating and maintaining the hospitals and other facilities under the control of said Board, be levied by the common council of the city and the Boards of Trustees of such towns as may be included in the district, and that the taxes collected upon such levies be placed in a

special fund and that the Board of Public Health and Hospitals have full, complete and exclusive authority to expend *for and on behalf of said city,* such unincorporated town and such other governmental units as may become a part of such Public Health and Hospitals District all sums of money thus realized, and that warrants for such expenditures shall be drawn by the controller of such city upon vouchers of such Boards of Public Health and Hospitals.

It is further provided that for the purpose of raising money for the repair, construction and equipment of hospitals, clinics, health centers or dispensaries or the remodeling thereof, or structures needed in connection with the operation thereof (§ 18), the Board of Public Health and Hospitals may cause to be issued in the name of the city, bonds of such Public Health and Hospitals District in an amount not to exceed the total cost of such repairs, construction, equipment, etc. A copy of the resolution ordering such bonds must be certified to the City Controller, whose duty it is to prepare the bonds and same shall be executed by the mayor of said city and attested by the city controller.

It is provided that no bonds shall be issued in excess of two per cent of the total valuation of the property within such District (§ 18), and that such bonds shall not be an indebtedness of such city, but shall be an indebtedness of said Health and Hospitals District and shall be payable only out of a special tax levied upon all the property of said Health and Hospitals District (§ 18). It is further provided that the Board of Public Health and Hospitals shall levy said special tax in such manner as to meet and pay the principal of said bonds as they severally mature, together with all accruing interest thereon (§ 18b). The tax so levied each year shall be certified to the City Controller and to the

Auditor of the County and shall be collected in the same manner as state and county taxes are collected and the money so collected shall be accumulated and kept in a separate fund to be known as the "Health and Hospital Bond Fund" and shall be used to pay said bonds as they mature, and interest as it accrues, and for no other purpose.

It will be observed that the Act of 1945 as amended in 1947 does not divorce the new department from the city in which the new setup is designed to operate. The very first section of the Act of 1945 provides that a department of public health and hospitals is created *in* cities of the first class having a population of not less than 300,000. This language tends more to indicate a legislative intent to identify the new department with the city than it does to indicate a separation of such department from the city. Section 2 transfers the powers and duties of the existing department of health and charities of such cities to the new department, including the operation and maintenance of the existing city hospital and its equipment and facilities, but at no place in the act are the existing hospitals and facilities owned by the city transferred to the new department. The general control of the new department is placed in a Board of Public Health and Hospitals (§ 3), the members of which are appointed by the mayor (§ 4). The budgets for the various activities of the new department are prepared by the heads of three divisions into which the new department is divided, but are reviewed by the Board of Health and Hospitals, and, upon approval, the board certifies the budget to the mayor for presentation to the city council (§ 6g), which, with the boards of trustees of the towns which are also included in the district, levies a tax sufficient to provide the necessary funds (§ 17) for the efficient operation

of the department. Because of the relativity small amount of taxable property in the towns, substantially all money for the operation of the facilities of the new department is provided by the tax levied by the city council. The records and accounts of the department *may* be kept by the city controller and the city controller *shall* maintain general control accounts of all appropriations and funds and shall make all disbursements for and on behalf of the department, except disbursements from funds derived from gifts and bequests (§§ 12 and 17). Thus it seems that the control of the new department remains very effectually in the city. The administering board is appointed by the mayor; the budget is submitted to the mayor and city council, and operating expense must be met by taxes levied by the city council; the city controller in effect keeps an eye on its bank account and pays its bills, and the money so raised is expended in the words of the statute, *"for and on behalf of the city."* (§ 17). It is only when it comes to the matter of capital investments and financing same by bonds that the real change brought about by the new legislation is disclosed. It is only then that there is any substantial autonomy in the new district, and, even then, there are ties which identify the old with the new. The bonds are issued in the name of the city, the resolutions authorizing them are certified to the city controller, and the city controller prepares the bonds and they are executed by the mayor and attested by the city controller.

We have analyzed the statutes and are referring to the sections thereof which seem to identify the old setup with the new because, as we view the case, it turns upon whether the new arrangement provided by the statute creates a new and independent entity or whether it is a subterfuge which serves to permit an

enlarged debt limit for the city of Indianapolis in evasion of Art. 13 of the Constitution. If actual control of the new mechanics for exercising the old functions remains in the city, that is a proper matter to consider in determining the question of evasion.

In *Cerajewski* v. *McVey* (1947), 225 Ind. 67, 72 N. E. 2d 650, we recently considered the primary question presented by the case before us. It is not necessary, therefore, that we discuss here in detail the applicable law. It is sufficient to say that by that case and the cases therein cited, it seems to be established that there may be more than one governmental unit in identical territory and that in proper cases the debt limitation imposed by the Constitution applies separately to the indebtedness of each unit and not to the indebtedness in the aggregate of two or more units, but that when we meet such a situation we must examine it carefully and look through form to substance and where we find something, the effect of which is in substance to evade the intent of the Constitution, we must condemn it, no matter what form it takes.

No hard and fast rules to test the question of evasion in cases of this kind can be laid down. Each case must stand on its own bottom. In each case, we must look to the true inwardness of the situation, in the light of the purpose of the constitutional provision. If, on the whole, the real effect seems to be to increase borrowing power in the exercise of substantially the same governmental function, in substantially the same area, rather than better to accomplish a public service, then there has been an evasion and Article 13 has been violated.

It was stipulated that on March 14, 1881, when Article 13 of the State Constitution became effective, there was in existence as an integral part of the municipal structure of the City of Indianapolis a Board

of Health, and, continuously since that time, there has been such a board which has performed, in a general way, the duties imposed by the 1945 act as amended in 1947, upon the Department of Public Health and Hospitals of the City of Indianapolis thereby created.

It was further stipulated that for over 50 years the City of Indianapolis has maintained a hospital, which began in a very small way and has grown to be a very large institution. It has been financed by the City of Indianapolis within its general two per cent debt limit imposed by Art. 13 of the Constitution of Indiana. When the Department of Public Health and Hospitals of the City of Indianapolis was organized in accordance with the provisions of the Act of 1945 the existing hospital and facilities then owned and operated by the City of Indianapolis were turned over to the new department for operation, and a new "district," to which the legislature attempted to give a new and additional debt limit of two per cent, was created. The area of this new district is substantially the same as the area of the City of Indianapolis. The town of Woodruff Place was included and the town of Ravenswood has since become a part of the district, but these additional areas are comparatively so small and contribute comparatively so little to the taxable property of the district that for practical purposes we may treat the areas as identical under the doctrine of *de minimis non curat lex*. On January 19, 1949, the taxable property of Indianapolis was $596,128,940, to which Woodruff Place and Ravenswood added only $1,725,350. The practical result, therefore, is that the people of the City of Indianapolis, by virtue of the Act of 1945, as amended in 1947, have had the limit of debt which may be imposed upon them and their property enlarged by an additional two per cent notwithstanding Art. 13 of the Constitution; and the

enlargement was for the avowed purpose of financing an activity or function of government which, for a long time before had been, and at the time of the adoption of Art. 13 of the Constitution was being, and ever since has been, exercised and financed by the City of Indianapolis within its constitutional two per cent debt limit.

The purpose of Art. 13 of the Constitution obviously was to minimize the burden of excessive debt by the several governmental units in the performance of their functions. When Art. 13 was adopted, the functions of government having to do with boards of health and hospitals had, as we have seen, long reposed in the cities of the state. It is hard to believe that those who conceived the debt limitation idea contemplated that it could be circumvented by the simple device of violating tradition and custom and lifting health and hospital service from the city's realm of activity and putting it in a new and separate governmental unit, embracing substantially the same territory, with a debt limitation all its own. This would not lessen the burden of debt. Such change in form ought not to avoid the impact of Art. 13 of the Constitution merely because the territory is dubbed a district in addition to being a city. Whether incurred in one name or another, ultimately it would have to be paid by the same taxpayers of the same areas. And the addition or subtraction of territory so small as to be inconsequential in effect does not change the situation. If it did, it is clear we would have a ready device to evade the constitution. To shift a governmental function from an old governmental unit to a new one in the same area in effect would, to the extent of indebtedness incurred by the new unit, in connection with the exercise of such function, enlarge the debt limit within which the exercise of the function had been financed. This has been

done by the statute under consideration. With this in mind, and with the further fact in mind, that substantial control remains in the city, with only a little change in mechanics, we are almost compelled to think that the change was made for the purpose of circumventing the constitutional debt limitation, and, even though made with the best of motives, it transgresses our fundamental law. If within our constitution, as it is, we cannot finance necessary hospital additions and improvements then we should amend the constitution, not flout it.

If a separate government unit with a separate and independent debt limit for health and hospitals may be created, then a separate unit to exercise the functions of the fire and police departments can be carved out. If a city hospital can be so financed, why not a city hall or any other essential city function or building. If these things can be done then the debt limitation of the constitution for all practical purposes is nullified.

Appellees argue that there could have been no intent to evade the debt limitation provision of the constitution, either by the Legislature or by those who advocated the passage of the 1945 act, or the 1947 amendment, because no steps to issue bonds were taken until October, 1948, whereas the 1945 act became effective March 6, 1945, and the amendment became effective March 13, 1947. They seem to believe that if evasion had been the purpose, more prompt action would have been taken. That may be true, but it is not material in reaching a conclusion in this case. The new setup may have been innocently conceived with the best motives in the world, but in testing the constitutionality of legislation, courts do not look to motives or the wisdom or desirability of the end sought to be attained. We may look only to the effect and result, and, if the

new legislation, however desirable, appears to be a device which in fact serves to circumvent the constitutional debt limitation provision, we have no choice but to condemn it. Paraphrasing the words of Judge Elliott, in the case of *Town of Winamac, et al. v. Huddleston* (1892), 132 Ind. 217, at p. 218, 31 N. E. 561, we may regret that the bonds to build additions to and improvements in the Indianapolis City Hospital may not be issued "but we can not escape the force of the strong and plain provision of our organic law."

The appellees urge upon us strongly the case of *Board of Com'rs. etc. v. Harrell et al.* (1897), 147 Ind. 500, 46 N. E. 124. They argue from that case that because the bonds here involved are payable out of a fund arising from a special tax they do not create an indebtedness within the inhibition of the constitution. The Harrell case involved the construction of free gravel roads under the provisions of the gravel road act of 1893 (Acts of 1893, p. 196). The question was whether the bonds to be issued to construct the roads would create an indebtedness of the township in excess of two per cent of the assessed value of the property of said township. The court held that the bonds were not an indebtedness of the township and therefore were not within the debt inhibition of the constitution so far as the township was concerned.

In the Harrell case the court makes it perfectly clear that the tax levied for the creation of a fund from which to pay gravel road bonds was in the nature of an assessment of special benefits for local improvements and the opinion goes little further than to hold that the constitutional inhibition against excessive debt does not apply to bonds payable only by assessments upon property specially benefited by a local improvement on account of which the bonds were issued. The benefits arising from

the provisions of the act of 1945 as amended in 1947 are not special and are not of the type ordinarily financed by assessments upon property specially benefited. They are general and the reasons for holding indebtedness for local improvements not an indebtedness of the township in that case, does not apply here. Roads and streets have through the years been thought of and considered as local improvements properly paid for by special assessments for the purpose. Hospitals, on the other hand, have through the years been thought of as city-wide institutions and their establishment and maintenance have been among the general functions of local government paid for out of general taxes.

The opinion in the Harrell case was criticized by the opinion in *Board of Com'rs of Switzerland County* v. *Reeves et al.* (1897), 148 Ind. 467, 46 N. E. 995. The author of the opinion in the Reeves case thought that the Harrell case mistakenly held that the bonds involved did not create a debt of the township because they were payable only out of a fund created by a special tax and hence did not constitute an infringement of Article 13 of the Constitution. We are disposed to agree with the author of the opinion in the Reeves case, but we are not disposed to overrule the Harrell case. We recognize the reason for and the wisdom of the doctrine of *stare decisis*. We do not know the extent to which the rule laid down in the Harrell case has been acted upon and we do not overrule it, although we think it badly decided. We are disposed, however, to limit the application of the rule laid down in the Harrell case to what have long been thought of as local public improvements and not to permit it to be extended to situations such as that before us.

Appellees also argue that conditions have so changed and are now such that the Indianapolis City Hospital serves many people living outside the city and that,

therefore, the city alone should not be compelled to finance the hospital. This argument is not persuasive with us. The new statutes do not cure this evil. As a matter of fact, under the proposed new setup there will be substantially as many people in Marion County outside the city who are not included in the new district as there were before the new setup came into existence. It is true that health and hospital services in many circumstances cannot be denied, but provisions can be made for payment for services by those able to pay, as well without a new debt limitation district as with. Arrangements could be made with outlying or overlapping governmental units for the services of the hospital and sanitary forces of the city just as is done in connection with police and fire protection for smaller cities by nearby larger cities.

We conclude that hospitals are not local improvements for which special assessments may be levied under the Harrell case, and that the acts of 1945 and 1947 herein considered are, to the extent they permit indebtedness beyond the two percent debt limitation of the city of Indianapolis, an evasion of Art. 13 of the Indiana Constitution. The fact that the new bonds sought to be issued would not, if charged against the city, increase the city's indebtedness beyond two per cent does not render the issuance of such bonds free from attack. They were issued according to procedure set up in the part of the 1945 and 1947 acts, which we have found to be repugnant to the Constitution.

The judgment is reversed, with instructions to sustain appellant's motion for a new trial.

Emmert, J., dissents.

NOTE.—Reported in 87 N. E. 2d 77.

### Dissenting Opinion

EMMERT, J.—Our Constitution draws the line to provide a "government of laws and not of men,"[1] whether the men be in the executive department, or sit in the legislative department, or even sit upon the court with power to interpret the Constitution and declare laws of the General Assembly invalid. But when this court indulges in the field of constitution making by usurping the functions of the General Assembly which proposes constitutional amendments, and dispensing with the necessity of adoption by the people, under the guise of an interpretation unwarranted by the wording of the Constitution, or the many well decided cases of this court to the contrary, notice of the occurrence should be brought into the record. The power reposed in this court to declare a solemn act of the Assembly in violation of our Constitution is a necessary power under our scheme of government, but at the same time it is a dangerous power, and for that reason should be used with great reluctance. This court at an early date recognized and appreciated such grave responsibility.

> "The constitution is paramount to any statute, and whenever the two are in conflict the latter must be held void. But where it is not clear that such conflict exists, the court must not undertake to annul the statute. This rule is well settled, and it is founded in unquestionable wisdom. The apprehension sometimes, though rarely, expressed, that this rule is vicious, and constantly tends toward the destruction of popular liberty, by gradually destroying the constitutional limitations of legislative power, results from a failure to comprehend the character of our forms of government, and the fundamental basis upon which they rest. The legislature is peculiarly under the control of the popular will. It is liable to be changed, at short intervals, by elections.

---

[1] Art. XXX. Part the First-Constitution of Massachusetts.

Its errors can, therefore, be quickly cured. The courts are more remote from the reach of the people. If we, by following our doubts, in the absence of clear convictions, shall abridge the just authority of the legislature, there is no remedy for six years. Thus, to whatever extent this court might err, in denying the rightful authority of the law-making department, we would chain that authority, for a long period, at our feet. It is better and safer, therefore, that the judiciary, if err it must, should not err in that direction. If either department of the government may slightly overstep the limits of its constitutional powers, it should be that one whose official life shall soonest end. It has the least motive to usurp power not given, and the people can sooner relieve themselves of its mistake. Herein is a sufficient reason that the courts should never strike down a statute, unless its conflict with the constitution is clear. Then, too, the judiciary ought to accord to the legislature as much purity of purpose as it would claim for itself; as honest a desire to obey the constitution, and also, a high capacity to judge of its meaning. Hence, its action is entitled to a respect which should beget caution in attempting to set it aside. This, with that corresponding caution of the legislature, in the exercise of doubtful powers, which the oath of office naturally excites in conscientious men, would render the judicial sentence of nullity upon legislative action as rare a thing as it ought to be, and secure that harmonious co-operation of the two departments, and that independence of both, which are essential to good government." *Brown* v. *Buzan* (1865), 24 Ind. 194, 196, 197.

See also *State ex rel. Harrison* v. *Menaugh* (1898), 151 Ind. 260, 266, 51 N. E. 117, 357; *State* v. *Gerhardt* (1896), 145 Ind. 439, 450, 451, 44 N. E. 469; *School City of Marion* v. *Forrest* (1906), 168 Ind. 94, 98, 78 N. E. 187.

"The legislature is supreme, except as limited by the Constitution." *State ex rel. Workman* v. *Goldthait* (1909), 172 Ind. 210, 220, 87 N. E. 133. "There is this

difference in the rules of construction of the federal and state constitutions: The congress may do nothing that is not permitted expressly or by clear implication; the legislature may do anything that is not forbidden expressly or by clear implication." *In re Application of Bank of Commerce* (1899), 153 Ind. 460, 462, 463, 53 N. E. 950, 47 L. R. A. 489. "The constitutions of the several states, unlike the federal constitution, are not grants of power. On the contrary, they are limitations on the legislative powers of the states." 12 C. J. § 167, p. 745.

Before this court has the right to declare an act of the General Assembly unconstitutional, it must be clearly shown that the act violates some provision of the Constitution, or "unless some constitutional restriction can be designated, a legislative act must be held authoritative." *State* v. *Patterson* (1914), 181 Ind. 660, 664, 105 N. E. 228. Article 13 does not prohibit the legislature from creating additional political or municipal corporations or taxing districts. It merely states what will happen when a two per centum debt limitation for any political or municipal corporation is exceeded. "No political or municipal corporation in this State shall ever become indebted in any manner or for any purpose to an amount in the aggregate exceeding two per centum on the value of the taxable property within such corporation, to be ascertained by the last assessment for State and county taxes, previous to the incurring of such indebtedness; *and all bonds or obligations, in excess of such amount, given by such corporations, shall be void:* . . ."[2] (Italics supplied.)

---

[2] The remainder of said Article is as follows: "Provided, That in time of war, foreign invasion, or other great public calamity, on petition of a majority of the property owners, in number and value, within the limits of such corporation, the public authorities, in their discretion, may incur obligations necessary for the public protection and defense, to such an

"In construing constitutional provisions, a rule of general acceptance is 'that which is expressed makes that which is silent to cease.' *Gougar* v. *Timberlake* (1897), 148 Ind. 38, 48, 46 N. E. 339, 37 L. R. A. 644, 62 Am. St. 487." *State* v. *Patterson* (1914), 181 Ind. 660, 664, 665, 105 N. E. 228, *supra*.

In construing § 12 of Article 9 of the Constitution of Illinois, which contains a five per centum debt limitation on municipal corporations, the Supreme Court of that state said: "The prohibition of a thing, by name, in the constitution, is equivalent to an admission of what is not named. *Prettyman* v. *Supervisors, etc.*, 19 Ill. 406, 411." *Wilson* v. *Board of Trustees of the Sanitary District of Chicago* (1890), 133 Ill. 443, 478, 27 N. E. 203, 211.[3]  The only logical interpretation of Article 13 is that bonds or obligations which do not exceed two per centum of the value of taxable property within the corporation are valid and that only bonds or obligations in excess of such amount shall be void. If the debt capacity has not been exhausted, and bonds should be issued up to and beyond the debt limitation, only the bonds in excess of the limitation should be void. If the Constitution intended to void the entire issue, it would have said so. As the amendment stands, the words "and all bonds or obligations in excess of such amount, given by corporations, shall be void" would be surplusage if an entire bond issue was in an amount which used up the

amount as may be requested in such petition." [Amendment, in lieu of four old sections. Adopted March 14, 1881.]

[3] The constitutional provision of the Illinois Constitution of 1870 states: "No county, city, township, school district, or other municipal corporation, shall be allowed to become indebted in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county taxes, previous to the incurring of such indebtedness. . . ." Article IX, § 12.

remaining two per centum limitation and exceeded the limitation. Why was it necessary to say the excess should be void if the whole issue was to be void? The decisions from other states under statutory or constitutional debt limitation provisions which are not as specific as Article 13, follow the construction that only the excess sum should be treated as a nullity. *Turner* v. *Woodson County* (1882), 27 Kan. 314; *Kansas City R. Co.* v. *Hendricks* (1922), 150 La. 134, 90 So. 545; *Kirby* v. *Monroe* (1921), 214 Mich. 615, 183 N. W. 216; *Schmitz* v. *Zeh* (1904), 91 Minn. 290, 97 N. W. 1049; *Smith* v. *Rockford* (1907), 9 Ohio C. C. (N. S.) 465; *Chicago R. R.* v. *Osage County* (1888), 38 Kan. 597, 16 Pac. 828; *Aetna Life Ins.* v. *Burrton* (1896), 75 Fed. 962; *Columbus* v. *Woonsocket Sav. Inst.* (1902), 114 Fed. 162.

Concerning the Iowa Constitution[4] the Supreme Court of that state said:

". . . The question now arises, is the district liable for the amount of indebtedness within the restricted limit. We think it is. As we have seen, the constitutional inhibition operates upon the in-

---

[4] The 1857 Constitution of Iowa, by § 3 of Article XI, provided: "No county, or other political or municipal corporation shall be allowed to become indebted in any manner, or for any purpose, to an amount, in the aggregate, exceeding five per centum on the value of the taxable property within such county or corporation —to be ascertained by the last State and county tax lists, previous to the incurring of such indebtedness."

In the following cases it was assumed that the Indiana constitutional provision was taken from the Iowa Constitution: *City of Valparaiso* v. *Gardner* (1884), 97 Ind. 1, 9, 10; *City of LaPorte* v. *Gamewell Fire Alarm Telegraph Co.* (1896), 146 Ind. 466, 469, 45 N. E. 588. This was questioned in *Voss* v. *Waterloo Water Co.* (1904), 163 Ind. 69, 83, 71 N. E. 208, which noted that Illinois, Wisconsin, West Virginia and Missouri also had similar constitutional provisions. However, the wording of the Indiana Constitution is more definite and specific as to the effect of the excess debt.

debtedness, not upon the form of the debt. The district may become indebted to the amount of $2,057.50 by bond. If the debt exceeds that amount, it is void as to the excess, because of the inhibition upon the power of the district to exceed the limit, and the bonds as to the same excess are void because of the non-existence of a valid debt therefor. But this restriction does not extend to the sum of $2,057.50 for which the district had power to issue its bonds. That sum is a valid debt. The bonds to that extent are valid." *McPherson* v. *Foster Bros.* (1876), 43 Iowa 48, 72.

This construction was not presented by the briefs in *Cerajewski* v. *McVey, et al.* (1947), 225 Ind. 67, 72 N. E. 2d 650, although by the stipulation of facts the School City of Hammond had a bonding capacity of $1,092,400 before the two per centum limitation was exceeded. The proposed bond issue was in the sum of $1,998,000, thus exceeding the constitutional limit by $905,600. In that case this court erred in holding the entire issue void, even if it be assumed that the Technical-Vocational High School District of the City of Hammond was in fact nothing more than the School City of Hammond.[5] The Cerajewski Case relied upon the case of *Hively* v. *School City of Nappanee* (1929), 202 Ind. 28, 169 N. E. 51, 171 N. E. 381, 71 A. L. R. 1311, and quoted with approval its language to the effect that that which cannot be done directly may not be done indirectly. This is not an infallible major premise either in construing a constitution or a statute. That an avoidance is not an evasion,

---

[5] Chapter 138 of the 1945 Acts was an attempt to provide a dual common school system not contemplated by § 1 of Article 8 of the constitution, which requires the legislature "to provide, by law, for a general and uniform system of Common Schools . . . ." High schools are a part of the common school system. *Greathouse* v. *Board of School Commissioners of City of Indianapolis* (1926), 198 Ind. 95, 151 N. E. 411.

was recognized by this court in the later case of *Jefferson School Township* v. *Jefferson Township School Building Co.* (1937), 212 Ind. 542, 10 N. E. 2d 608, wherein the lease of a school building with option to purchase was held constitutional. At page 551, this court, in its opinion by Judge Treanor, said:

> "The fact that the building company was willing to give the school building to the Jefferson School Township when the building company had been paid an amount equal to its investment and a reasonable return thereon does not change the lease-contract into a contract to purchase. It is true that the Jefferson School Township, through the device of a long term lease providing for annual rental payments, may become the owner of a school building which, in view of Article 13 of the State Constitution, it could not have acquired in 1928 by issuing bonds. But it does not follow that either the arrangement or the result constitutes an evasion of the limitations of Article 13 of the State Constitution. . . ."[6]

Nor was the case of *Voss* v. *Waterloo Water Co.* (1904), 163 Ind. 69, 71 N. E. 208, 66 L. R. A. 95, quoted with approval in the Cerajewski case, followed by this court in *Bollenbacher* v. *Harris, Mayor* (1925), 196 Ind. 657, 148 N. E. 417, wherein this court held that the debts of the Bloomington Water Company were not the debts of the City of Bloomington, even though the city had subscribed to all of the common stock of the water works corporation except nine shares.

"It is said in Cooley, *Taxation*, 113: 'Taxing districts may be as numerous as the purposes for which taxes are levied. The district for a single highway may not be the same as that for the schoolhouse located upon it.

---

[6] A long term lease of a city hall with option to purchase does not violate Article 13. *City of South Bend* v. *Reynolds* (1900), 155 Ind. 70, 57 N. E. 706, 49 L. R. A. 396.

It is not essential that the political districts of the state shall be the same as the taxing districts, but special districts may be established for special purposes, wholly ignoring the political divisions.' " *Brown* v. *Miller* (1904), 162 Ind. 684, 686, 71 N. E. 122. That this is the law is admitted by the majority opinion and the Cerajewski case. But when it is denied that the hospital taxing district is for a local public improvement for which bonds may be issued which are not debts, as held by the numerous decisions construing Article 13, the majority is faced with the dilemma of deciding either that the taxing district is substantially a new municipal corporation, or that it is substantially the civil city of Indianapolis.[7] If the hospital district is a new municipal corporation, there is no provision in the constitution which prohibits its creation, and its debts would not be the debts of Indianapolis. The other horn of the dilemma is equally fatal to a reversal, for if the taxing district is substantially the civil city of Indianapolis, as the majority opinion clearly holds, then the bond issue of $2,600,000 is clearly valid, for under the stipulated facts in this appeal, the constitutional bonding limit of the city was over $11,000,000, and at all times mentioned in the stipulation the aggregate bonded indebtedness of the city, including the hospital district and its proposed new issue of bonds, left a surplus bonding capacity. On

---

[7] Section 48-8418, Burns' 1933 (1947 Supp.), (Acts 1945, ch. 200, § 18, p. 639; Acts 1947, ch. 323, § 10, p. 1288) provides: "Said bonds shall not in any respect be a corporate obligation or indebtedness of said city [Indianapolis], but shall be an indebtedness of said health and hospitals district as a special taxing district, and said bonds and interest thereon shall be payable only out of a special tax levied upon all the property of said health and hospitals district as in this act provided, and said bonds shall so recite such terms upon their face, together with the purpose for which they are issued. . . ."

January 19, 1949, such unused and available bonding capacity, before reaching the two per centum limit, was more than $4,500,000. To hold the proposed issue void because the hospital act, ch. 200 of 1945 Acts, as amended by ch. 323 of 1947 Acts, § 48-8401 *et seq.*, Burns' 1933 (1947 Supp.), permits an evasion of the constitutional debts limitation of the city of Indianapolis, but admit that the bonds when included in the aggregate of the indebtedness of the city would not exceed the two per centum limitation, is judicial constitution making unwarranted by any authority and unparalleled in the books. We are not construing the federal constitution, but a state constitution, under which, in the absence of any federal question, the authority of the legislature is supreme unless clearly restrained by that constitution.

The fact that from an earlier date the cities of this state have been vested by the legislature with authority to care for matters of health is of no controlling significance in determining the issues in this appeal. Matters of health come within the general police powers of the state, which the legislature may delegate to municipal corporations within its discretion. Municipalities are creatures of the legislature, and their powers are subject to its control in the absence of any constitutional restriction. See *State ex rel. Board of Commissioners of County of Hendricks* v. *Board of Commissioners of County of Marion* (1908), 170 Ind. 595, 85 N. E. 513. "A municipal corporation is not clothed with any vested right in a public office; nor, indeed, does it possess a vested right in public property. It has been long and firmly settled that the charters of public corporations may be repealed or altered as the Legislature, in the exercise of its constitutional powers, deems proper. *Sloan* v. *State,* 8 Blackf. 361; *Meriwether* v. *Garrett,* 102 U. S.

472; *Coffin* v. *State, ex rel.,* 7 Ind. 157; 1 Dillon, *Municipal Corporations,* §§ 61, 63, 71 (4th ed.). See, also, authorities collected in Elliott, *Roads and Streets,* p. 320." *The State ex rel. City of Terre Haute* v. *Kolsem et al.* (1891), 130 Ind. 434, 437, 29 N. E. 595. The principles involved in legislative exercise of the police power have been well stated by Judge Fansler in *Edwards* v. *Housing Authority of City of Muncie* (1939), 215 Ind. 330, 335, 19 N. E. 2d 741, as follows:

> "That the legislature has power to protect public health, safety, morals, and welfare, and to exercise and to authorize the exercising of the power of taxation and eminent domain, and the raising and expenditure of public funds for such purposes, cannot be doubted. From time to time boards and commissions have been created and authorized and vested with authority to carry out projects for the protection of the public. The name given to such instrumentality is of no significance, nor do we find any limit upon the character or number of public corporations or bodies politic, which the legislature may authorize or create to accomplish such purposes."

The fact that the act provided a plan whereby certain officials of the City of Indianapolis had duties to perform in the operation of the Department of Public Health and Hospitals should not prevent the existence of this separate taxing district. Since the adoption of the 1881 amendment to the constitution, this court has time after time validated taxing districts which were operated by officials of an existing municipal corporation whether or not the area of the taxing district coincided with the area of the municipal corporation.[8] But

---

[8] "It is not unusual for the Legislatures of the several States in the Union, in the exercise of the general power of taxation, as well as in the power of local assessments, to create a special taxing district, without regard to municipal or political subdivisions

in this appeal the area of the taxing district is substantially larger than the City of Indianapolis, since Woodruff Place, by operation of the act, is incorporated as a part of the district, and other incorporated cities or towns by petition may become a part of the district, as Ravenswood has already done. The assessed valuation of Woodruff Place and Ravenswood is $1,725,350. To strain the maxim *de minimis non curat lex* to justify ignoring this stipulated fact distorts the maxim beyond recognition. No doubt it will be most interesting to the taxpayers of these municipalities to learn that their assessed valuations are so small that the law will consider them as trifles, but when they go to the county treasurer's office to pay their taxes they can hardly escape these liabilities on the ground that their property values are so small that the law should ignore them.

Nor is there any reasonable ground for denying that a hospital may be a local public improvement. The guarantee against excessive municipal indebtedness provided by Article 13 does not prohibit the creation of special taxing districts for local improvements, nor does it purport to say that only public improvements existing

---

of the States, and to levy a tax on all property within such district by a uniform rule, according to its value, for the purpose of aiding in the construction of public local improvements.

"Our laws providing for street improvements, for the construction of free gravel roads, for the construction of ditches and drains, and for aid in the construction of railroads, are examples of this kind of legislation.

"True, in most cases, such improvements are paid for by local assessments against real property, which, in theory, is benefited to an amount equal to the assessment. But it is by no means universally true that such improvements are paid for by assessments against real estate supposed to be benefited; but, on the contrary, they are often paid for by the assessment of a tax on all property found within the taxing district." *Gilson v. Board of Commrs. of Rush County* (1891), 128 Ind. 65, 70, 27 N. E. 235, 11 L. R. A. 835.

at the time of its adoption could be considered public improvements for all time, "for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise. . . . ." *Euclid* v. *Ambler Realty Co.* (1926), 272 U. S. 365, 387, 47 S. Ct. 114, 71 L. Ed. 303, 310. There are no cases in the Indiana books showing that sewage disposal plants were in existence in this state in 1881. Are we, therefore, to hold that a sewage disposal plant would not be a local improvement to be paid for under the taxing power exercised in a taxing district?[9] Is not the hospital, which cares for the typhoid patient and may cure some typhoid carrier just as much a part of our sanitation system under modern government as the sanitary sewer system with its disposal plant which disposes of and makes harmless the results of such illnesses. Why then should a hospital be incapable of being a local public improvement? The lands and property within such district receive an even greater benefit than from a public park, which this court in *Johnson* v. *Board of Park Commissioners* (1930), 202 Ind. 282, 174 N. E. 191, held a local public improvement, or from roads, streets or boulevards which have never been successfully questioned as local public improvements.

The correctness of the law on taxing districts for local public improvements delared in *Board of Commissioners of County of Monroe* v. *Harrell* (1897), 147 Ind.

---

[9] The borrowing authority of a Sanitary District, which included provisions for a sewage disposal plant, was held no violation of the debt limitation provisions of the Illinois constitution. *People ex rel. Village of South Chicago Heights* v. *Bergin* (1930), 340 Ill. 20, 172 N. E. 60.

500, 46 N. E. 124, has not been questioned by this court until the decision in this appeal. The arguments against the Harrell case appearing in *Board of Commissioners of Switzerland County* v. *Reeves* (1897), 148 Ind. 467, 46 N. E. 995, which are the reasons for holding the present issue of hospital bonds invalid, were not those of the court, and Judge McCabe makes it perfectly clear he was only expressing his own personal opinions and not those of the court.

We are not dealing with the guarantees of due process, or a bill of rights, but with a specific prohibition which does not prohibit the creation of new political subdivisions, or the financing of local public improvements by means of bond issues to be paid by assessments or special taxes. Article 13 draws the line; the line may not be evaded, but it may be lawfully avoided. The Indiana cases on the creation of taxing districts for financing of public improvement have consistently held that the prohibition may be lawfully and constitutionally avoided, just as completely as this court, within this term, lawfully avoided the effect of Chapter 146 of the 1949 Acts, which established United States Central Standard Time as the legal time within the state, by conducting the business of the court on Central Standard time, but also advancing one hour earlier the time schedule for transacting court business.

At common law there was no restriction on the amount of debt which the sovereign or its political subdivisions could incur. As to whether or not any act evades rather than avoids a constitutional prohibition depends upon the constitutional intention, but it must be remembered always that this intention must be an expressed intention as contained in the exact and specific words used. If we establish the rule that each case must stand on its own bottom, and we will look through form to sub-

stance by looking to the effect and result to see if any act violates Article 13, we permit an elastic construction raised to the nth degree, depending upon the preconceived ideas of a passing majority of this court as to the desirable manner in which public improvements should be financed. "With the justice, the propriety, the policy, the advisability or desirability or undesirability of a statute, the courts can have nothing whatever to do, so long as the act does not infringe some provision of the constitution, State or Federal, or some valid treaty or law of Congress. Such objections must be made to the Legislature." *State ex rel. Smith, Attorney General* v. *McClelland* (1894), 138 Ind. 395, 399, 37 N. E. 799. There should be some stability and symmetry to the law, and precedents based on sound existing reasons should be respected.[10] The judgment of the trial court should be affirmed.

NOTE.—Dissenting opinion reported in 88 N. E. 2d 150.

---

[10] "We fully endorse the language of the world's greatest commentator, when he says: 'It is an established rule to abide by former precedents, where the same points come again in litigation: as well to keep the scales of justice even and steady, and not liable to waver with every new judge's opinion; as also because the law in that case being solemnly declared and determined, what before was uncertain, and perhaps indifferent, is now become a permanent rule, which it is not in the breast of any subsequent judge to alter or vary from according to his private sentiments: he being sworn to determine, not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one.' 1 Black. Com., p. 69." *Haskett et al.* v. *Maxey et al.* (1893), 134 Ind. 182, 188, 33 N. E. 358.